## Bowling Green Gas Light Co. v. Dean's Extx.

(Decided March 9, 1911.)

### Appeal from Warren Circuit Court.

1. Electricity—Duty and Liability of Electric Companies.—It is the duty of electric light companies to use the highest degree of care and skill known which may be used under the same or similar

circumstances, to so insulate or protect its wires as to make them free from danger to those who may be brought in contact with them.

2. Action for Pain and Suffering.—The personal representative of a person who dies as the result of personal injuries received several days before his death, has the right to bring an action for the pain and suffering of the deceased between the date of the injury and the death, or an action for the loss sustained on account of the destruction of his power to earn money occasioned by his death.

3. Damages.—An award of $6,750.00 in an action for pain and suffering, where the deceased lived six days after he was injured, is not so excessive as to justify the conclusion that it was the result of passion or prejudice.

4. Photographs as evidence.—A photograph that presents an accurate picture of objects and things relevant to the matter under investigation may be introduced as evidence.

5. Assumption of Risk.—A lineman of a telegraph company, in ascending one of its poles, on which were also strung electric wires, does not assume the risk of injury received by reason of coming in contact with the electric wires, unless he knows, or by the exercise of ordinary care could know, they are not properly insulated. He owes no duty of inspection or examination, and is only obliged to exercise ordinary care to prevent injury to himself.

6. Application of Principles.—A lineman of a telegraph company in the performance of his duties on one of its poles on which was strung wires of an electric company, came in contact with the exposed and uninsulated end of a heavily charged wire, receiving a shock that resulted in his death. Held, under the facts his personal representative was entitled to recover damages.

SIMS & RODES and T. W. & R. C. P. THOMAS for appellant.

GUY H. HERNDON, B. F. PROCTOR, GRIDER & HARLIN and GREENE, VANWINKLE & SCHOOLFIELD for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

John W. Dean was a lineman for the Western Union Telegraph Company. He had been so employed for a number of years, and was an experienced and competent man. The Bowling Green Gas Light Company used in the city of Bowling Green the poles of the telegraph company for the purpose of running its wires. In April, 1909, Dean, in the performance of his duties for the telegraph company and while on one of its poles in the city of Bowling Green, came in contact with one of appellant's wires that was heavily charged with electricity, and as a result he fell from the pole which he was climb-

ing, a distance of some twenty-five feet, receiving injuries from which he died six days thereafter.

In this action to recover for his pain and suffering between the date of his injury and death, his personal representative charged in her petition that the wire with which he came in contact was defective and dangerous and was placed so near the pole as to render the place dangerous and unsafe for Dean in the discharge of his duties. The answer was a traverse and plea of contributory negligence. Upon a trial before a jury, she recovered damages in the sum of $6,750.

There is no dispute between the parties as to the cause of Dean's injury or death. It is conceded that in the discharge of his duties he had ascended the telegraph company's pole and was several feet from the ground when he received the shock from the wire of the appellant company that caused him to fall. Nor is any issue made concerning the fact that Dean was a skillful, experienced and careful lineman, who knew that the wires of the appellant company upon which it conveyed its electric current were strung on the pole of the telegraph company when and where he was injured and carried a dangerous or deadly voltage.

Two employes of the telegraph company were present assisting Dean at the time he received the injuries, and they testified that a tap wire of the appellant company that run from its main wire into a transformer was connected with the main wire at a point near the telegraph pole, and that Dean's hand was on the main wire at this point. This tap wire was wrapped around the main wire, and insulated at the junction, with the exception of a small part of the extreme end, which was not insulated. They further said there was a copper wire of the appellant company fastened to the side of the telegraph pole that run from the ground up the pole to a point above where Dean was when he received the shock. It is further shown that if Dean's hand came in contact with the exposed end of this tap wire while some other part of his body was against the wire that run up the pole from the ground, a circuit would be created that would produce the shock he received. And also that if the end of this tap wire had been properly insulated, no serious harm would have come to Dean if he had touched it or the main wire while some other part of his body was against the wire on the pole. Based on this evidence, it

is the theory of appellee that Dean, in ignorance of the fact that the extreme end of the tap wire was not insulated, took hold of or placed his hand on the main wire at the point where the tap wire was connected with it, and at this moment his leg came in contact with the wire on the pole, and thus a circuit was formed. In short, the contention is that the company was negligent in failing to have the end of this tap wire insulated, as it should have been if the degree of care imposed upon electric companies had been observed. On the other hand, there is evidence for the appellant that there was no wire running up the pole a sufficient distance to permit Dean's leg or foot to touch it from the point at which he was located when struck by the current. That there was no exposed or uninsulated wire at the point where his hand came in contact with the main wire. Its theory of the accident being that Dean carelessly and negligently put his hand on the main wire that he knew or in the exercise of ordinary care should have known was carrying a heavy and dangerous current of electricity; and, although this main wire, as well as the tap wire, was properly insulated, a circuit through Dean's body was formed by the fact that his leg or foot came in contact with a lead cable or some other grounded metal on the telegraph pole while his hand was on the wire. This view of the case is supported by the evidence of experts, who say that however well a wire carrying a heavy current of electricity may be insulated, it is dangerous to touch it when some other part of the body is in contact with a metal substance that goes to the ground. And so it is contended by appellant that Dean, who knew the danger of coming in contact with electric wires, came to his death by his own negligence.

From this summary of the evidence it will be noticed that there were two questions of negligence presented. One tending to show that Dean was negligent in putting his hand on the main wire, and the other conducing to show that the company was guilty of negligence in failing to have the end of the tap wire insulated. We cannot say under the evidence that Dean was guilty of such negligence as would defeat a recovery merely because he placed his hand upon the main wire, as it is shown that if it and the tap wire had been properly insulated no harm would have come to him from taking hold of them or either of them. There was sharp dispute in the evi-

dence upon these vital issues, but it was for the jury to say under proper instructions whether or not Dean's death was caused by his negligence or that of the company, and they found against the company. If the end of the tap wire was not insulated, as it should have been, there can be no doubt that the company was guilty of negligence. It was its duty to exercise the highest practicable degree of care and skill to have its wires at this place so insulated as to make them free from danger. Dean had the right to assume that the company had performed this duty, unless he knew or in the exercise of ordinary care in the discharge of his duties could have known it had not. There is no evidence that he knew of the defective condition of this wire, nor can it be said that in the exercise of ordinary care he could have discovered that the extreme end of this tap wire was exposed. The exposed portion was very small, but yet sufficient to kill if touched by a person who was grounded.

With the evidence in the condition stated, the court properly instructed the jury that:

"It was the duty of the defendant, the Bowling Green Gas Light Co., to use the highest degree of care and skill known, which may be used under the same or similar circumstances, to so insulate or protect its wires as to make them free from danger to those who may be brought in contact with them; and if they believe from the evidence that the said company failed to so insulate or protect the wire with which the plaintiff's decedent came in contact, and that his injuries were caused as the direct result of such failure, then the law is for the plaintiff, and the jury should find for the plaintiff such a sum in damage as will be a fair and reasonable compensation for the mental and physical suffering of said decedent, if any, caused by said injury, not to exceed $25,000; unless they further believe from the evidence that in receiving his injury plaintiff was himself negligent, and that but for his own contributory negligence, if any, he would not have been injured."

Counsel in criticism of this instruction say that the court in effect told the jury that it was the duty of the company to so insulate or protect its wires as to make them free from danger, and thus imposed upon the company a higher degree of care than the law required or authorized, and such a degree of care as made it absolutely an insurer of the safety of persons coming in con-

tact with its wires. But we do not think the instruction open to the objection urged against it. When read and considered as a whole, it merely told the jury that it was the duty of the company to use the highest degree of care and skill which might be used under the same or similar circumstances to so insulate or protect its wires as to make them free from danger. In other words, the instruction did not put upon the company the duty of making its wires free from danger, but only the duty of using the highest degree of care and skill practicable under similar conditions to make them free from danger. This is the standard measure of duty imposed by this court upon companies using heavily charged electric wires. Mangan's Admr v. Louisville Electric Light Co., 122 Ky., 476; McLaughlin v. Louisville Electric Light Co., 100 Ky., 173; Paducah Ry. Co. v. Bell, 27 Ky. Law Rep., 428. Nor is this degree of care an unreasonable requirement. When a company is using in the conduct of its business an agency so subtle and deadly, as electricity, in places where persons have the right to go and be, the highest degree of skill and care attainable should be exercised to protect them from danger. Applicable to this case, it was said in Overall v. Louisville Electric Light Co., 20 Ky. Law Rep., 759, that:

"Appellant at the time he was struck was in a place where his business required him to be, and where he had a right to be; and it was the duty of the electric light company to know that linemen of the telephone company would have to come into close proximity to its wires in attending to their duties. It was its duty to use every precaution which was accessible to insulate its wires at that point and at all points where people have the right to go for business or pleasure, and to use the utmost degree of care to keep them so; and for personal injuries resulting from its failure in that regard, it is liable in damages."

It may be true, as testified by some of the expert witnesses in this case, that all heavily charged electric wires are dangerous, and that no practicable method has yet been devised that will prevent injury to persons who come in contact with such wires. But this very fact makes it more important and necessary that companies operating these wires should exercise the highest known care and skill to make them as free from danger as is practicable. And, as it is shown by the evidence that

when these wires are properly insulated, and the insulation is properly maintained, that persons may come in contact with them and yet not be harmed, it is really not essential to inquire in this case whether insulation that will insure perfect safety is possible or practicable.

Instruction No. 2 is also criticised. Considered alone, it may be objectionable; but, when read in connection with the instruction we have quoted, and which laid down the standard of care the company was required to exercise, we do not think it was prejudicial.

The instruction upon the subject of contributory negligence, given at the instance of the appellee, although not accurately phrased, contains in substance the usual instruction given upon this subject. And in addition to this, there was submitted to the jury in a series of well written instructions given by the court at the instance of counsel for appellant every phase of contributory negligence that could excuse the company for its negligence.

It is next insisted that the amount of damages assessed by the jury was excessive. The administratrix had the right to elect to bring her suit to recover damages for the pain and suffering of the decedent from the time of his injury until his death, or to recover such damages as would compensate his estate for the destruction of his power to earn money occasioned by his death. She elected to bring her action for the pain and suffering of the deceased. He lived six days after his injuries; and during these six days, although unconscious a portion of the time, suffered the most excrutiating pain. What in reason the jury should have awarded as compensation for this period of torture cannot be measured in dollars and cents. It is hopelessly incapable of reasonable ascertainment. No rule has ever been or ever will be discovered by which the human mind can estimate in money the suffering of a human being. In view of this inevitable condition, the courts have been obliged to leave to the sound discretion of a properly instructed jury the sum that will be allowed, and have adopted the practice of not interfering with their finding, unless it is so excessive as to leave the impression that it was the result of prejudice or passion. Considered from this standpoint, we cannot say the award was excessive. Newport News & Mississippi Valley Co. v. Dentzel, 91 Ky., 42.

The argument is made that although the appellee could not join a cause of action for pain and suffering with a cause of action growing out of the death of her decedent, that yet the jury in awarding the damages were influenced to give the large amount they did as part compensation at least for the destruction of Dean's life. It was of course impossible to keep from the jury the fact that Dean died as a result of the injuries he received, and it is entirely within the bounds of probability that the jury to some extent were influenced in fixing the damages by the loss his widow, the executrix, sustained on account of his death. But, if this were so, it was unavoidable. The jury were told that they could not allow any damages for the death of Dean and it does not appear in any tangible way that they did so.

It is further assigned as error that counsel for appellee was guilty of misconduct in argument in misrepresenting the testimony and in alluding to the death of Dean. We have read the argument objected to and do not consider it reversible error. The court in the two instances referred to promptly and properly admonished the jury that they should not be misled by the argument of counsel, but were to be governed in their decision of the case by the evidence and the law submitted to them in the instructions.

Exceptions were also saved to the ruling of the court in refusing to permit Fitch and other witnesses to answer certain questions. We have examined the questions excluded, and the avowals of what the witnesses would say, and do not find that the exclusion of this evidence was at all prejudicial. No evidence was rejected that served to illustrate or support any material issue in the case, or if it did, the point had been fully covered by other evidence.

Sometime after the injury, a photograph of the telegraph pole and wires, with a man on the pole in the position Dean was at the moment he received the shock, was taken and this photograph over the objection of appellant was introduced as evidence for the appellee. It is insisted that the admission of this photograph was error, especially because it showed a man on the pole intended to represent Dean, although it is not claimed that the photograph does not correctly represent the scene of the injury or the position Dean was in. There can be no doubt that witnesses who were present when

Dean was injured, and who saw where he was and the position he was in, could have described to the jury his attitude the situation of the wires, and such surrounding objects as would throw relevant light on the matter being investigated. This being so, we are unable to perceive why a correct photograph of these objects and things would not be permissible as evidence. In the trial of cases, like this, it is important that the jury shall have as clear an understanding of the situation as can be furnished, and relevant information may be conveyed to them by pictures or models that they can see and examine or by the words of witnesses who describe the conditions as they existed. When a witness describes a scene or a place, there is made in the mind of the juror a picture intended to represent what the witness said. But if a juror can see this picture as in a photograph, he has a better and more intelligent understanding of what is represented by it than he could well get from a verbal description. The photograph only displayed objects, things and positions that the witnesses who were present described, or might have described, as best they could. It represented conditions as they actually were and not the theory of one party or the other. It is a matter of common and approved practice to introduce on the trial of cases maps, models and diagrams for the purpose of aiding the jury in getting a good understanding of the thing or place in controversy. Objects on these maps, models and diagrams are pointed out and described to the jury by the witnesses and frequently witnesses are allowed to take positions in the presence of the jury for the purpose of illustrating where the actors stood and their positions when the matter under investigation occurred, and we can think of no sound reason why a photograph that furnished an accurate reproduction of objects and places and things that are germane to the matter being investigated are not as competent as the other aids that we have mentioned. Of course, the accuracy of a photograph as a correct reproduction of what it purported to show should be established to the satisfaction of the court before being admitted as evidence, but when its accuracy is shown, we have no doubt of its admissibility. Wigmore on Evidence, secs. 790-7; L. & N. R. R. Co. v. Brown., 127 Ky., 732; Higgs v. Minn. & St. P. R. Co., 15 L. R. A., n. s., 1162; Dederich v. Salt Lake City R. Co.,

14 Utah, 137, 35 L. R. A., 802, and note; Elliott on Evidence, vol. 2, secs. 1224-8.

The final contention of counsel is that as Dean knew the danger of coming in contact with electric wires, and was thoroughly familiar with the situation of the wires on this pole, he assumed the risk of injury, and voluntarily placed himself in a position of peril, or carelessly brought upon himself the injury that resulted in his death —in either of which event there should be no recovery for the accident that happened to him. We have heretofore stated that Dean was a competent and experienced man thoroughly familiar with the danger of coming in contact with electric wires and that he knew the location and character of wires that were on this pole. But, granting this, it is a mistake to say that he assumed the risk of injury by these wires unless it were shown (and it was not) that the danger was so apparent or obvious that a person of his experience and intelligence would not have acted as he did. He owed no duty of inspection or examination. He was only obliged to exercise ordinary care to prevent injury. He had the right to assume that the wires were properly insulated, unless he knew or by the exercise of ordinary care in the discharge of his duties could have ascertained that they were not; and, as we have heretofore stated, he was not guilty of negligence in this respect that would defeat a recovery. On the other hand, the appellant company owed to him the duty of keeping its wires properly insulated, and this the jury found it did not do. Dean, of course, knew the place he was working was alive with danger, but there is no evidence that he knew it was more dangerous than it should have been. He did not know that the appellant would expose him to needless peril, or have any information that it had not performed its full duty in making the place as safe as it could have done. He did not voluntarily or otherwise assume any risk except such as resulted from the hazards of the place after it had been made as safe as it could be made.

A careful investigation of the record satisfies us that no substantial error was committed, and the judgment is affirmed.