## Kitchen, Administratrix v. Hillside Coal Company.

(Decided May 15, 1917.)

### Appeal from Muhlenberg Circuit Court.

1. **Master and Servant—Safe and Unsafe Way of Doing Work.—** When there is a safe way and an unsafe way of doing a thing, and the servant voluntarily selects the unsafe way, when he knows and appreciates, or in the exercise of ordinary care for his own safety should know and appreciate, the danger attending the unsafe method, the master will not be liable for any injury or accident which may happen to him.

2. **Master and Servant—Safe and Unsafe Way of Doing Work—Negligence of Master.—** Where the unsafety of the place at which the servant is injured is caused by the negligence of the master,

and the servant does not know or appreciate, and in the exercise of ordinary care could not have known or appreciated that it was unsafe, the master will be liable if he is injured while exercising ordinary care for his own safety.

3. Master and Servant—Electric Wires—Failure to Keep Insulated.— Where the insulation on an electric wire used in the operation of a machine in a coal mine was permitted by the master to remain in a defective condition, the master will be liable if a servant is injured on account of this defective condition if the servant did not know, and in the exercise of ordinary care could not have known, of the defective condition.

4. Master and Servant—Custom of Doing Work.—Where it was customary for a hostler in a coal mine to load a cutting machine before disconnecting the electric wire, his failure to disconnect the wire before loading the machine will not defeat a recovery on account of an accident that happened to him, although if he had disconnected the wire the accident would not have happened.

C. A. DENNY and NEWTON BELCHER for appellant.

HUBERT MEREDITH and TAYLOR, EAVES & SPARKS for appellee.

OPINION OF THE COURT BY JUDGE CARROLL—Reversing.

The appellant, as administratrix of her deceased husband, Alvie Kitchen, instituted this action in the Muhlenberg circuit court to recover damages for the alleged wrongful death of her husband, which occurred in the mine of the appellee coal company. The right of recovery was based upon the failure of the coal company to furnish the decedent with a safe place, safe tools and safe appliances in which and with which to perform his labors as hostler on a coal cutting machine used in the mine.

The answer was a denial, a plea of contributory negligence, and assumed risk.

After the issues had been made up, the case went to trial before a jury, and at the conclusion of the evidence for the administratrix the court directed the jury to return a verdict for the coal company, and from the judgment upon this verdict this appeal is prosecuted.

There was in use in the mine a machine for undercutting coal, which was run by electrical power. The electric current was conveyed from a power-house on the outside of the mine by what was called a main cable to a point about 75 feet distant from where the decedent was working at the time of his death. From the main

cable to the machine at which he was working the current was conveyed by what was called a "reel cable." This reel cable was an insulated wire some two hundred feet long, which was wound around a reel, having a short connection that carried the current from the reel to the machine. As the work of cutting the coal in the room was carried forward the reel cable was unwound and the reel carried along near the machine. This reel cable could be and was in this instance connected with the main cable by taking the insulation from the small wires of the reel cable, crooking them and hanging them over the main cable. When the work of cutting a room was completed the reel cable could be detached from the main cable by taking hold of it with one hand back of the reel and giving it a jerk, which straightened out the little wires of the reel cable and allowed them to slide off the main cable.

The decedent was a hostler or helper to the operator of the machine, and it was his duty to look after the reel cable and disconnect it whenever it was necessary to do so. The mining machine at which decedent was working weighed several thousand pounds, and was conveyed from one room to another in the mine on a truck, which ran on a track. When the machine was to be put in operation cutting coal, it was taken off the truck, and reloaded when necessary to move it to another room. The machine could be and was loaded on the truck by implements attached to the truck, and not by electrical power.

On the occasion of this accident the reel cable had not been disconnected from the main cable and the decedent came to his death, when as hostler he was helping to load the machine on the truck, by stepping on the reel cable, at a point on the cable from which the insulation had worn off, so that when he stepped on the cable his foot came in contact with the live wire.

William Griggs, the operator of the machine, putting his evidence in narrative form, testified that the decedent, as they were loading the machine on the truck, stepped on a naked place on the reel cable and was almost instantly killed. That the reel cable was in bad condition. That it had been used a good while and the insulation had worn off in places, and had worn off about four inches at the point where decedent stepped on it. He said the reel cable was laid on the floor of the entry,

which was wet and in places covered with water. That decedent had been helping about the machine probably thirty minutes when he was killed, and that was the first time he had worked with that machine and cable. That the decedent did not know of its defective condition and had no opportunity to ascertain its condition, but that the mine boss had known of the defective condition of this particular cable for some fifteen days before the accident, because he had seen the defects in the cable, that is, the want of insulation, and had been told about it three or four times, but had made no effort to repair it. That it was in the same condition at the time decedent was killed as it was at the time the mine boss examined it some days before.

He further said that if the cable had been insulated, the decedent could have stepped on it with safety. In reference to the custom of loading the machine on the truck, he said it was usual to load the machine before disconnecting the reel cable from the main cable. That when the machine was loaded the hostler disconnected the cable. He further said that the reel cable could be disconnected from the main cable at the machine by giving the reel cable a jerk which would straighten out the ends of the wires and cause the reel cable to slip off the main cable, and that if the reel cable had been disconnected before they undertook to load the machine on the truck, the decedent could have walked and worked about the machine and truck without danger from electricity, as the current, if the disconnection had been made, would have been confined to the main cable, which was 75 feet away. He also said it was the duty of the hostler to make disconnection. Other miners gave testimony substantially the same as Griggs'.

The effect of this evidence was: (a) that the insulation on the reel cable, which was lying on the wet floor of the mine near the machine, was worn off in places to such an extent that the heavily charged wire was exposed, and this defective condition was known to the mine boss some two weeks before Kitchen came to his death; (b) that the decedent, although a miner of some experience, had been working at this particular machine for only a few minutes before he was killed and did not know of the defective insulation or that it had worn entirely off in places; (c) that it was the duty of the decedent as hostler to disconnect the reel cable from the

main cable, and this he could have done by standing at the machine and giving the reel cable a little jerk, and that if the reel cable had been disconnected before they undertook to load the machine on the truck the place about the truck and machine would have been safe; (d) that it was customary in the mine not to disconnect the reel cable until after the machine had been loaded on the truck, and that if the cable had been properly insulated, no injury would have come from stepping or standing on it.

On these facts the argument is made by counsel for the coal company that the trial judge properly took the case from the jury, because the decedent had two courses he might have pursued, one a safe and the other an unsafe one, and voluntarily chose the unsafe method. Or, in other words, that he attempted to load the machine on the truck with the current on the reel cable, which was the unsafe way, when he could have pursued the safe plan of disconnecting the reel cable from the main cable before undertaking to help load the machine.

It is a very well established principle in the law of master and servant that when there is a safe way and an unsafe way of doing a thing, and the servant voluntarily selects the unsafe way, when he knows and appreciates, or in the exercise of ordinary care for his own safety should know and appreciate, the danger attending the unsafe method, the master will not be liable for any injury or accident which may happen to him. But we do not think this principle should be applied to the facts of this case, because the unsafety of the place was caused by the negligence of the master in not keeping the wire insulated, of which negligence the servant was ignorant.

In this case a safe place was made unsafe by the negligence of the master, and the servant did not know or appreciate, and in the exercise of ordinary care could not have known or appreciated under the circumstances, that it was unsafe. The safe and unsafe rule is applied only to states of case in which two ways are open to the servant, one safe, the other unsafe, and he voluntarily selects the unsafe way when he knows and appreciates or in the exercise of ordinary care could know and appreciate, the danger of adopting the unsafe way or method. That it was negligence on the part of the coal company to knowingly leave this electric wire uninsulated

at the place where the decedent stepped on it, is not open to argument in view of the rule announced in numerous opinions of this court setting out the high degree of care the master must exercise in looking after the safety of heavily charged wires that are situated in exposed places: McLaughlin v. Louisville Electric Light. Co., 100 Ky. 173; Bowling Green Gas Light Co. v. Dean,, 142 Ky. 678; Lancaster v. Central City Light & Power Co., 137 Ky. 353; Paducah Light & Power Co. v. Parkman's Admr., 156 Ky. 197.

Nor should the coal company be exonerated from liability for its negligence because the decedent failed to disconnect the reel wire before loading the machine. There was no rule of the company requiring this to be done. On the contrary, it was customary not to do it, and under these circumstances it cannot be said that the decedent was guilty of such negligence as would defeat a recovery merely because he followed a custom of the mine and did not disconnect the reel cable before attempting to load the machine. What we have said is, we think, sufficient to dispose of the only question before us. Without expressing any opinion as to the merits of the case, or what the verdict of the jury should be with all the evidence before them, we are yet satisfied that the case was one for the jury.

Wherefore, the judgment is reversed, with directions to proceed in conformity with this opinion.