CLEVELAND ELECTRIC ILLUMINATING Co. *v.* O'CONNOR ET AL.

(Decided February 25, 1935.)

*Messrs. Squire, Sanders & Dempsey,* for plaintiff in error.

*Messrs. Howell, Roberts & Duncan* and *Mr. P. H. Mitchell,* for defendants in error.

TERRELL, J. Patrick O'Connor recovered a judgment in the Court of Common Pleas of Cuyahoga county against The Cleveland Electric Illuminating Company and defendant in error Ursprung, for injuries claimed to have been sustained by O'Connor while he was working on the premises of the illuminating company at what is known as its transformer station, between Bedford and Northfield. The illuminating company prosecutes error in this court, and among other things complains that the trial court made the wrong application of the legal theory of inherent danger.

The facts in the case show that the illuminating company had let certain work to an independent contractor, Ursprung; that Ursprung had sublet this work to another contracting firm, Vogt & Conant; that Patrick O'Connor was an employee of Vogt & Conant.

The premises of the illuminating company where this work was to be performed were at the company's Northfield substation, which property consisted of several acres of land. It was proposed to install there certain transformers to reduce high voltage electricity to a lower voltage. The electricity was conveyed from its power plant at Ashtabula over a high tension wire carrying 132,000 volts of electric current. This wire was supported by towers of skeletal steel framework some sixty feet high. The wires suspended between these towers were approximately fifty-two feet above the ground, being the height at which such high-powered wires are usually carried by towers over the countryside. In arranging for its transformers it was proposed to do certain work which necessitated the erection of other skeletal steel frame-work towers upon cement piers, which towers when completely erected would rise to a maximum height of about forty-two feet, which additional towers were to be placed immediately below the high-tension wires, or in close

proximity to a position immediately below said wires, so that when completed there would be between the high tension wires and the top of the new towers, a distance of at least ten or twelve feet at the nearest point. The contract for this construction work was let by the illuminating company to R. S. Ursprung, and he then sublet certain of said work to subcontractors Vogt & Conant. A crew of men, employees of Vogt & Conant, had proceeded with the work by assembling the steel tower upon the ground some distance from where it was eventually to be erected upon the cement piers. They then proceeded to convey this skeletal tower by the use of a crane which was attached to an automobile truck. The arm or boom of this crane was thirty-six feet long, with a sixteen-foot extension. The skeletal steel tower was lifted by the boom, and the automobile truck proceeded to convey said tower toward the abutment. Several of the workmen, employees of Vogt & Conant, proceeded to walk along with and to guide the tower from unduly swinging upon the cable. Patrick O'Connor was one of these men. While in the course of conveying this tower to the cement pier the tip of the boom came in contact with the high tension wires, causing a violent discharge of electricity, from which Patrick O'Connor sustained his injuries.

In letting this contract, the illuminating company retained no control over the method of the performance of this work by Ursprung, or by his subcontractors, Vogt & Conant.

Patrick O'Connor claimed that the illuminating company was negligent in that because of the inherent danger connected with said work the company failed to exercise ordinary care in providing a "safety man" to watch and warn the workmen so that said boom of the crane would not come in contact with the high tension wires. The illuminating company contended

there was no such duty upon it to furnish a "safety man" to warn the workmen while their work was in progress. It contended that its duty to exercise ordinary care was fulfilled when it had made known to the contractor, the subcontractors and the workmen all the conditions of danger attendant upon the performance of such work.

The record clearly discloses that the contractor, subcontractors and all of the workmen, especially including Patrick O'Connor, were well aware of the dangers from electricity surrounding the performance of this work.

Patrick O'Connor testified that he knew the wires were charged. He had worked around the job several weeks before; had been warned before to keep away from such wires, and knew that they were "live wires." The high-tension wires were not hidden; they were open to the view of all workmen, and all the workmen knew that they were there and that they were charged with high tension electricity.

Patrick O'Connor contended that because of the inherent danger connected with this work the illuminating company could not relieve itself of liability by letting this work to an independent contractor. Both O'Connor and the illuminating company asserted that the act of lifting the boom of the crane so as to cause it to come in contact with the high tension wire was an act of negligence.

The theory of the inherent danger doctrine is a benign theory of the law, whereby one who has been injured through no negligence on his part may recover damages for such injuries from the owner or proprietor who has let the work to an independent contractor—the injuries resulting from some negligent act of the independent contractor in the performance of said work. The theory of this law is that because of the inherent danger connected with the work in ques-

tion the proprietor cannot relieve himself of the responsibility when the independent contractor is negligent in a way which results in injury to another. This doctrine of inherent danger inures to the benefit of third persons who have been injured without negligence on their part. It does not inure to one actively participating in the performance of the work.

The trial court submitted the case to the jury only on the theory that the work to be done was inherently dangerous and that there could be no delegation of care to an independent contractor. The questions of error complained of have been narrowed to a consideration of the one question whether this work was inherently dangerous, and whether, therefore, defendant was required to have a so-called ''safety man'' present at the time. The defendant contended that the inherent danger theory did not apply.

It is our opinion that the doctrine of inherent danger does not apply in this case. O'Connor was not a stranger to the work. He was a member of the crew whose negligence caused the event complained of, and out of which his injuries resulted. He was an active participant in the events with full knowledge of all the conditions surrounding the place and with full knowledge of its dangers.

Counsel for O'Connor have cited many cases to sustain his contention that the doctrine of inherent danger applied to this case. But in all the cases cited the party claiming to have been injured was a third party, not in any way connected with the work in question, except in the one case of *Jacobs, a Minor,* v. *Fuller & Hutsinpiller Co.,* 67 Ohio St., 70, 65 N. E., 617, 65 L. R. A., 833. In that case a boy about fifteen years of age was employed to work at machinery, which was furnished by defendant and operated in defendant's plant, which machinery was dangerous when operated by one who had not been properly instructed in its use.

The boy in attempting to operate the machinery was injured. It was claimed that plaintiff was injured because defendant neglected to notify him of the dangerous character of the machine, and neglected to give him instructions in the operation thereof. It was claimed by defendant that plaintiff was employed by an independent contractor. The court held that the defense that the plaintiff was an employee of an independent contractor would not avail defendant, because it was an undisputed fact that defendant had agreed to furnish the machinery and material, and this machinery was dangerous to plaintiff because he had not been properly instructed in its use. The court stated on page 73:

"It is a case in which, under the circumstances shown, 'a resulting injury * * * might have been anticipated as a direct or probable consequence of the performance of the work contracted for, if reasonable care is omitted in the course of its performance.' "

The reasonable care omitted was the failure of the defendant to instruct in the dangers of the machine.

That case is distinguished from the instant case in that O'Connor and his fellow workmen were fully aware of all the conditions and dangers incident to the work on the property of the illuminating company. The company did not neglect to advise and warn O'Connor of the conditions and dangers. There were no hidden dangers not known to them. No negligence therefore appears on the part of the defendant.

For the reasons that the trial court made a misapplication of the doctrine of inherent danger in his instructions to the jury, and that no negligence of the defendant appears, the judgment of the Common Pleas Court will be reversed and final judgment entered for plaintiff in error.

*Judgment reversed, and judgment for plaintiff in error.*

LIEGHLEY, P. J., concurs in judgment.

LEVINE, J., dissenting. The history of the case is set forth in the majority opinion. I shall quote such operative facts as are necessary to a determination of the question involved.

It appears that the illuminating company had let certain work to an independent contractor; that the independent contractor sub-let the work to another contracting firm, Vogt & Conant; that Patrick O'Connor was an employee of Vogt & Conant.

The premises of the illuminating company where the work was to be performed were at the company's sub-station in Northfield. It was proposed to install there certain transformers to reduce high voltage electricity to a lower voltage. The electricity was conveyed from an illuminating company power plant at Ashtabula over a high tension wire carrying 132,000 volts of electricity. The wire was supported by towers of skeletal steel frame work some sixty feet high. The wires suspended between these towers were approximately fifty-two feet above the ground. In arranging for its transformers, it was proposed to do certain work which necessitated the erection of other skeletal steel frame-work towers upon cement piers, which towers when completely erected would rise to a maximum height of about forty-two feet, which additional towers were to be placed immediately below the high tension wires. The contract for this construction was let by the company to a contractor, and by him in turn sublet to subcontractors, Vogt & Conant. A crew of men, employees of Vogt & Conant, had proceeded with the work by assembling the steel tower upon the ground some distance from where it was eventually to be erected upon the cement piers. This skeletal tower was then conveyed by the use of a crane which was attached to an automobile truck. The arm or boom of

this crane was thirty-six feet long with a sixteen foot
extension. The skeletal steel tower was lifted by the
boom, and the automobile truck proceeded to convey
the tower toward the abutment. Several of the work-
men, employees of Vogt & Conant, proceeded to walk
along with and to guide the tower from unduly swing-
ing upon the cable. Patrick O'Connor was one of these
men. While in the course of conveying this tower to
the cement pier the tip of the boom came in contact
with the high tension wires, causing a violent discharge
which caused the injuries to Patrick O'Connor.

It must be conceded that the illuminating company
when it let the contract for the construction of this
work retained no control over the method of perform-
ance, as it left all the details of performance to the
subcontractor. The mere statement of the operative
facts which led to the accident discloses clearly that
the work to be done was of a highly dangerous char-
acter. The presence of death-dealing electric current
in close proximity to the place where the men were en-
gaged in their work is in itself sufficient to character-
ize the enterprise as a highly perilous one. It is, there-
fore, in my opinion, properly claimed by counsel for
O'Connor that the work to be performed was inher-
ently dangerous, and that therefore the illuminating
company cannot delegate to an independent contractor
the duty imposed upon it to exercise care under the
circumstances.

The suggestion that the doctrine of inherent danger
only applies to those who were strangers to the work,
and not to those engaged in it, runs counter to the
weight of authority and to a careful consideration of
the doctrine itself. The majority opinion seems to con-
cede that the work in which these men were engaged
was inherently dangerous, but holds that the doctrine
of inherent danger, which would prevent the illuminat-
ing company from shifting its duty to the independent

contractor, does not apply because O'Connor was one of the crew engaged in the performance of the work. The majority opinion maintains that the application of the doctrine must be limited to strangers to the work, and does not apply to those who are engaged in it. In this view I cannot concur.

Once it is conceded that the work in which O'Connor was engaged is inherently dangerous, the legal consequence follows that the duty resting upon the illuminating company to exercise care under the circumstances continues to devolve upon such company, and that the company cannot shift such duty to an independent contractor who was employed to do the work. It is suggested that O'Connor, as well as the other members of the crew, were actually warned of the dangerous condition surrounding the work, and that the duty of the illuminating company ends when such warning is given. This, in my opinion, is not correct as a matter of law. If there is any duty devolving upon the illuminating company despite the employment of an independent contractor it is a duty to exercise ordinary care under the circumstances, which may reasonably involve the taking of precautions other than the mere warning of the workmen of the danger near them. Once it is conceded that some duty devolves upon the illuminating company toward the workmen engaged by the independent contractor in the doing of the work, ordinary care may require under the circumstances not only constant warning of the danger but also supervision and direction of the work. O'Connor, the injured man, was an employee of the subcontractors, and as such was subject to its peremptory orders. No blame can attach to him for doing what he was ordered to do. If the work was of such character that injury was likely to result despite the precautions taken, then there was a clear duty upon the illuminating company to shut off the current while

the work was going on in order to prevent injury and death to the workmen engaged in it.

The illuminating company apparently realized and appreciated the dangerous character of the work, because it appears from the record that on some occasions it had a safety man present when the towers were being lifted, who not only warned, but also supervised the work, so that the boom of the crane should not come in contact with the high tension wires.

It is claimed by counsel for the illuminating company that the presence of a safety man on occasions was a mere voluntary act on its part, and that it was under no legal duty to furnish such a safety man. While it may be true that the measure of the duty of the illuminating company cannot be determined by its voluntary acts, yet it bears upon the proposition that the company appreciated the dangerous character of the work. The authorities are seemingly agreed that while the measure of care required of electric companies is ordinary and reasonable care, yet, because of the character of electricity, ordinary and reasonable care with reference to it is tantamount to a high degree of diligence and foresight. 20 Corpus Juris, 341, Section 36.

In *Bowling Green Gas Light Co.* v. *Dean's Exrx.*, 142 Ky., 678, 683, 134 S. W., 1115, the court said:

"Nor is this degree of care an unreasonable requirement. When a company is using in the conduct of its business an agency so subtle and deadly, as electricity, in places where persons have the right to go and be, the highest degree of skill and care attainable should be exercised to protect them from danger."

*Fairbairn* v. *American River Electric Co.*, 170 Cal., 115, 118, 148 P., 788.

"Where death may be caused by an agency lawfully in use, *ordinary care requires that every means known,*

*or that with reasonable inquiry would be known, must be used to prevent it."* (Italics ours.)

In *Galveston-Houston Electric Ry. Co.* v. *Reinle,* 113 Tex., 456, 258 S. W., 803, an electric railway company employed an independent contractor to construct a causeway, which work necessitated the use of a derrick with a boom near the uninsulated high voltage wires of the railway company; it was held that it was the duty of the railway company to exercise ordinary care to give employees of the contractor notice or warning of the danger of the derrick boom coming in contact with or near the uninsulated wires, even though the contractor knew of the danger, and that for a breach of that duty, resulting in the death of the employees, the railway was liable.

In the last-named case the man who was electrocuted was assisting in the use of the derrick, and was signaling to the engineer on the derrick when and where to swing the boom. At the moment he had his hand on the lifting device attached to the cable, the cable was swung against the uninsulated wires of the railway company and he was electrocuted. I can see no differentiation between *Galveston-Houston Electric Ry. Co.* v. *Reinle, supra,* and the case at bar.

In setting forth the duty of electric companies there are illuminating suggestions in Curtis on the Law of Electricity, 889, Section 581, as follows:

"The [electrical] company is required, as to persons with whom it has no contractual relations, to exercise due care to prevent injury to persons who may be reasonably expected to come in contact with its appliances for business or pleasure. Thus, when an electric company enters into a contract with a person for the performance of certain work, on or near its electric system, though the latter has such control over the doing of the work as to be an independent contractor, the company is, nevertheless, required by

law to anticipate that such contractor and his workmen may come into proximity to its appliances, and the duty, therefore, is imposed on the company of exercising due care to the end that such contractor and workmen do not receive injuries from defects in the appliances.''

In 2 L. R. A. (N. S.), 777, the following case note appears:

''The duty charged on one who is engaged in the generation of electricity, to keep the wires within and about his building safe for the servants of another, who has contracted to perform certain work in or about the former's building, is imposed by the well-established and familiar doctrine that every man who, expressly or by implication, invites others to come upon his premises, assumes, to all who. accept the invitation, the duty to protect them from any danger incurred by coming, which he knows of or ought to know of, and of which they are not aware.''

See, also, *Stevens* v. *United Gas & Elec. Co.*, 73 N. H., 159, 60 A., 848, 70 L. R. A., 119, in which it was held that an electric company was liable to the workman of a subcontractor, engaged in building a power house on premises of the electric company, who, while working on a staging erected by the contractor, came in contact with charged wires of the electric company. Having invited the workman on the premises, the company owed the duty to protect him while he was working on the premises.

There was clearly a duty upon the illuminating company to exercise care not only to strangers, but to the workmen engaged in the performance of work recognized by the company to be dangerous, and which by mere statement of the facts appears to be dangerous.

This duty it cannot shift by the employment of a subcontractor. Once the existence of a duty on the part of the illuminating company is determined, the

precautions to be taken by it to prevent injury and death to the workmen engaged in the highly perilous work must be determined by the particular circumstances of the case. A mere warning to the workmen may not be sufficient, and the presence of a safety man to direct and supervise the work of lifting the towers may or may not be sufficient under the circumstances. If the circumstances disclose a situation where the taking of precautions will not in all probability prevent injury to employees who are engaged in the work, then it becomes the duty of the illuminating company, if necessary, to shut off the current so that the work can be done safely.

The illuminating company in the conduct of its business maintained a subtle and deadly agency in a place where persons were invited to be and work, and ordinary care, therefore, required that every means known, or which with reasonable inquiry would be known, must be used by it to prevent injury.

These are questions of fact which may properly be submitted to the jury for its determination. I am of the opinion that the facts presented on the part of O'Connor not only justify but compel the submission of the issues to the jury, and that the finding of the jury cannot be disturbed merely because the reviewing court may not agree with the conclusions of fact reached by the jury.

Therefore, in my opinion, the judgment should be affirmed.