Thomascean **GORMAN**, Appellant,

v.

Roy H. **HUNT**, Appellee.

No. 1998–SC–0159–DG.

Supreme Court of Kentucky.

June 15, 2000.

Gary R. Hillerich, Louisville, for Appellant.

Armer H. Mahan, Jr., Peterson S. Thomas, Lynch, Cox, Gilman & Mahan, P.S.C., Louisville, for Appellee.

KELLER, Justice.

## I. ISSUE

This pedestrian-motor vehicle accident case presents one primary issue. During his testimony, Dr. Smock, an expert witness for the driver Hunt, was allowed by the trial court, over the pedestrian Gorman's objection, to use posed photographs showing Gorman's position relative to Hunt's vehicle immediately prior to and at the time of the accident. The photographs illustrated Dr. Smock's opinion of how the accident occurred but were inconsistent with Gorman's version. Was it error for the trial court to allow the posed photographs to be used by Dr. Smock? Because we find that the trial court could have admitted the photographs into evidence, we find no error in their use by Dr. Smock, and, accordingly, we affirm the

decision of the Court of Appeals upholding the jury verdict in favor of Hunt.

## II. FACTS

Gorman was driving on Dixie Highway in Louisville and, as she neared the Dixie Highway—Watson Lane intersection, she noticed a wallet lying in the center turn lane of Dixie Highway. She pulled her vehicle onto the shoulder of the highway which, at this point, has two lanes of traffic in each direction and a center turn lane, for a total of five lanes. Gorman then exited her vehicle and proceeded on foot to retrieve the wallet from the highway. After securing the wallet, she was attempting to return to her vehicle when she was struck by Hunt's vehicle and seriously injured. Gorman filed this action against Hunt.

The primary factual dispute at trial was whether Gorman was in the center turn lane or in the left through lane when Hunt's vehicle struck her. Gorman claims that, as she pivoted around in the center turn lane after picking up the wallet, she saw Hunt's vehicle coming right at her and that, by the time she realized that Hunt did not see her, it was too late for her to get out of the way of Hunt's upcoming vehicle. On the other hand, Hunt claims that he was traveling in the left through lane when Gorman suddenly appeared in front of his vehicle and that he did not have sufficient time to react before his vehicle struck her.

In support of his version of the accident, Hunt called Dr. William Smock as an expert witness to testify as to the point of impact. During Dr. Smock's testimony, Hunt sought to introduce posed photographs showing Gorman's position relative to Hunt's vehicle immediately prior to and at the time of the accident. The series of photographs, which were taken in a vacant lot, depicted a woman bending down and picking up a wallet, rising, turning and then being struck by a vehicle similar to Hunt's while her right foot and leg are raised and her left foot is on the pavement. While the photographs were not in accordance with Gorman's version of the accident, they were supported by Dr. Smock's opinion of how the accident occurred. The trial court sustained Gorman's objection to the introduction of the photographs, but allowed Dr. Smock to use them, over Gorman's objection, for demonstrative purposes only during his testimony. However, during its deliberations, the jury sent a note regarding the posed photographs: "Are you sure we have all of the evidence? We are looking for the pictures with the lady standing in front of the Jeep (the recreation)." The trial court replied, "Those photos were for purposes of demonstrating testimony and not admitted as exhibits."

The jury returned a verdict in favor of Hunt. The Court of Appeals affirmed and we granted discretionary review. We too affirm.

## III. POSED PHOTOGRAPHS

Gorman argues that a posed photograph taken by one party to show the precise location of the parties at impact is not admissible and that the trial court, therefore, committed reversible error when Dr. Smock was allowed to use the photographs for demonstrative purposes because the jury considered them as evidence. In support of her argument, Gorman relies on *Welch v. L. & N.R. Co.*[1] and two of its progeny.[2]

In *Welch*, the plaintiff suffered an injury while standing near a railroad track when two of the defendant's vehicles, a hand car and a train, collided with each other. Because her location at the time of the accident was important, she posed for a photograph purporting to show her precise location at the moment of the colli-

1. 163 Ky. 100, 173 S.W. 338 (1915).

2. *Nunnelley's Adm'r v. Muth,* 195 Ky. 352, 242 S.W. 622 (1922); *Square Deal Cartage Co. v. Smith's Adm'r,* 307 Ky. 135, 210 S.W.2d 340 (1948).

sion. In holding that such photographs are not admissible, the Court stated:

> This photograph was taken some time after the accident. Plaintiff went with the ·photographer and stood where she claims to have been standing when the accident occurred. In other words, she merely posed for the picture. While photographs properly proven are competent for the purpose of showing conditions existing at the time, and the fact that a person occupying the position of the injured party is shown in the photograph is not ground for rejecting it as evidence, where the photograph is used merely to illustrate to the jury the circumstances under which the accident occurred, yet photographs are not admissible, when taken after the accident, to show the precise position of the party at the time of the accident. The party assumes the position; and as the picture is taken for the purposes of the trial, and the photographer relies on her statement, the effect is the same as if the photographer had gotten on the stand and testified that plaintiff told him that she was standing at that particular place. In other words, the photograph is self-serving, and cannot be used either to corroborate plaintiff, or supply evidence, as to her precise position at the time of the injury.[3]

But, while the predecessor to this Court has followed *Welch* in subsequent cases,[4] we find that the law regarding the admissibility of posed photographs is not so well-settled in Kentucky.

In a case preceding *Welch, Bowling Green Gaslight Co. v. Dean's Ex'x.*,[5] a lineman for a telegraph company came in contact with a live power line while working on a telegraph pole. At trial, the trial court allowed the plaintiff to introduce a posed photograph of a man on the pole in the claimed position of the decedent at the time of the accident. In its ruling upon the admissibility of the photograph, the Court stated:

> There can be no doubt that witnesses who were present when Dean was injured, and who saw where he was and the position he was in, could have described to the jury his attitude, the situation of the wires, and such surrounding objects as would throw relevant light on the matter being investigated. This being so, we are unable to perceive why a correct photograph of these objects and things would not be admissible as evidence.... When a witness describes a scene or a place, there is made in the mind of the juror a picture intended to represent what the witness said. But, if a juror can see this picture as in a photograph, he has a better and more intelligent understanding of what is represented by it than he could well get from a verbal description. The photograph only displayed objects, things, and positions that the witnesses who were present described, or might have described, as best they could.[6]

And, in a case subsequent to *Welch, Cincinnati, N.O. & T.P. Ry. Co. v. Duvall*,[7] the plaintiff suffered injuries while boarding the defendant's train and the crucial issue at trial concerned whether the defendant failed to provide a reasonably safe means for the plaintiff to board its train. The trial court rejected a posed photograph showing a person attempting to board a train by the same steps ascended by the plaintiff at the time of the accident. In concluding that the trial court erred in rejecting the posed photograph, the Court,

---

**3.** *Welch v. L. & N.R. Co., supra* at 340 (citation deleted).

**4.** *Nunnelley's Adm'r v. Muth, supra; Square Deal Cartage Co. v. Smith's Adm'r, supra; Hillman v. Hall,* 311 Ky. 790, 225 S.W.2d 667 (1949); *Nolan v. Commonwealth,* 311 Ky. 852, 226 S.W.2d 27 (1950); *Rexroat v. Commonwealth,* 312 Ky. 199, 226 S.W.2d 949 (1950).

**5.** 142 Ky. 678, 134 S.W. 1115 (1911).

**6.** *Id.* at 685–86, 134 S.W. at 1118.

**7.** 263 Ky. 387, 92 S.W.2d 363 (1936).

citing both *Welch* and *Bowling Green Gaslight* commented:

> When such a reproduction is made and it appears that it was done under substantially the same conditions complained of, we can conceive of no legal reason why the pictured demonstrations should not be competent. If they be true and accurate representations of the situation being investigated, we can conceive of nothing that would be more illuminating to the jury or that would be better calculated to put its members in complete possession of the actual facts. We know of no rule disallowing such evidence in such circumstances, and the cases are numerous from this and other courts upholding its competency.
>
> . . . .
>
> 'The practice of admitting photographs and models in evidence in all proper cases should be encouraged. Such evidence usually clarifies some issue, and gives the jury and the court a clearer comprehension of the physical facts than can be obtained from the testimony of witnesses.'[8]

*Tumey v. Richardson,*[9] the most recent case analyzing the use of a posed photograph, only adds to this uncertainty. Following a two-vehicle accident, a wrecker moved one of the vehicles a short distance from its location after the accident but left the other vehicle in place. To show the precise location of the vehicles immediately after the accident, the wrecker driver at the direction of a state trooper moved the one vehicle back to the position that he estimated it had occupied before he moved it and the trooper then took a photograph of the vehicles. In holding the photograph admissible and that any variance in the testimony of the witnesses as to the position of the vehicles went to the weight of the evidence rather than its sufficiency, the Court first stated, "[W]e have never held, where the question was raised, that photographs taken to show a witness's recollection of the location of moving objects are competent,"[10] but the Court then concluded:

> It is to be observed that the admissibility of photographs is within the sound discretion of the trial court, and its ruling in this respect will not be interfered with on appeal except upon clear showing of an abuse of discretion. The trend of authority has been said to be to vest more discretion in the trial court in matters of this kind. The trial courts are allowed a broad discretion in admitting or rejecting photographs.[11]

We have not addressed this issue now for more than thirty years. At that time, we "left the law in a state of uncertainty"[12] but noted a trend of authority suggesting trial courts should possess more discretion in such matters.[13] We believe it appropriate for us to reappraise the admissibility of posed photographs and eliminate the uncertainty created by our prior decisions.

The rationale that we previously advanced for not admitting posed photographs, i.e., that they could be excluded as hearsay,[14] self-serving,[15] incompetent[16] and representing of the theory of only one party,[17] has been criticized[18] and charac-

8. *Id.* at 366 (citation omitted).

9. Ky., 437 S.W.2d 201 (1969).

10. *Id.* at 205.

11. *Id.* at 205 (citations omitted).

12. R. Lawson, The Kentucky Evidence Law Handbook § 11.05, at 608 (3d ed. Michie 1993).

13. *Tumey,* supra.

14. *Welch,* supra.

15. *Id.*

16. *Nunnelley's Adm'r,* supra.

17. *Nunnelley's Adm'r,* supra; *Tumey,* supra; *Covington v. Friend Tractor & Motor Co., Inc.,* Ky.App., 547 S.W.2d 771 (1977) *Id.*

18. 3 Wigmore, Evidence 238 (Chadburn rev. 1970).

terized as "mak[ing] a very unpersuasive case for shielding triers of fact from this kind of evidence ...."[19] We agree. The principal concern of the Court in *Welch* and its progeny "seems to have been that posed photographs bring with them an extraordinary risk of testimonial misrepresentation."[20] Wigmore criticized this objection to photographs:

> The objection that a photograph may be so made as to misrepresent the object is genuinely directed against its testimonial soundness. It is true that a photograph can be deliberately so taken as to convey the most false impression of the object. But so also can any witness lie in his words .... [E]xcluding the photograph as misleading may be begging the very question which the jury ordinarily have to decide; it may be as anomalous as if the judge were to order a witness from the stand because he was believed by the judge to be lying. Actual perjury should not be thus determined in advance by the judge—not more for photographic than for verbal testimony.[21]

He also argued for their use:

> It would be folly to deny ourselves on the witness stand those effective media of communciation (sic) commonly employed at other times as superior substitute for words. If a simple line plan of a house is more satisfactory than a mass of alphabetical letters arranged in words as a mode of communicating the relative position of the house rooms as observed by us, then this method of communication is equally proper to be resorted to in a witness' communications to a jury.

There can be no dispute upon this point.[22]

McCormick, too, endorses the admissibility of photographs, and extends his endorsement even to those posed photographs which illustrate *a matter of disputed fact*:

> The orthodox theory of photographs as merely illustrated testimony ... can be viewed to support the admission of any photo reflecting a state of facts testified to by a witness and the current trend would appear to be to permit even photos of disputed reconstructions in some instances.[23]

■ We find truth in the old adage, "A picture is worth a thousand words." Trial attorneys demonstrate the value of photographs on a daily basis in the courtrooms of this state and we have no doubt that photographs frequently communicate the testimony of a witness to the jury more fully and accurately than the words in the testimony do. We can find no valid reason justifying an outright prohibition against the admissibility of a posed photograph used to reconstruct events involved in litigation even where there is conflicting testimony as to the facts on which the reconstruction is based. Accordingly, we hold that the admissibility of a posed photograph is a matter within the sound discretion of the trial court, and its ruling will not be interfered with on appeal except upon a clear showing of an abuse of discretion. Like other evidence, however, the trial court shall determine as a preliminary matter, prior to admitting any photograph into evidence, whether the posed photograph satisfies other requirements for ad-

**19.** R. Lawson, supra at 608.

**20.** R. Lawson, The Kentucky Evidence Law Handbook § 11.05 at 606 (3d ed. Michie 1993); see also *Duvall*, 92 S.W.2d at 366 ("If [photographs] be *true and accurate representations* of the situation being investigated, we can conceive of nothing that would be more illuminating to the jury or that would be better calculated to put its members in complete possession of the actual facts. We know of no rule disallowing such evidence in such circumstances." *Id.* (emphasis added)).

**21.** 3 Wigmore, Evidence 238 (Chadburn rev. 1970).

**22.** *Id.* at 218.

**23.** Cleary, McCormick on Evidence 673 (3d ed.1984).

missibility.[24]  First, the photograph shall be properly authenticated.[25]  "An authentic photograph is one that constitutes a fair and accurate representation of what it purports to depict."[26]  Thus, "the photograph must ... be verified testimonially as a fair and accurate portrayal of [what] it is supposed to represent."[27]  Second, the photograph must be relevant by having a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the photograph.[28]  "[I]f the fact to be evidenced by the photograph is itself not admissible, obviously it cannot be proved by photograph or otherwise."[29]  Third, the trial court must determine that the photograph's probative value is not "substantially outweighed by the danger of undue prejudice, confusion of the issues or misleading the jury, ... or needless presentation of cumulative evidence."[30]  Because of the deceptive possibilities of photographs, they should be subject to careful scrutiny by the trial court to determine whether the photograph will lead to undue prejudice and misrepresentation.  However, a variance presented by the testimony will often go to the weight of the evidence rather than to the admissibility of the photograph.[31]  Additionally, "[t]he trial court in its discretion may ... reject a photograph as being under the circumstances not sufficiently 'instructive'; in other words, the court may rule that cumulative testimony, by superfluously adding a pictured description to a verbal description, is on the facts not needed."[32]

▪ Gorman complains that the photographs show the model blindly walking into the path of Hunt's vehicle with her head pointed straight ahead as if she was totally oblivious to Hunt's vehicle and other vehicular traffic.  Dr. Smock did not use the photographs to offer his opinion as to the direction Gorman was facing, but instead, utilized the photographs to show Gorman's position relative to Hunt's vehicle at impact.  In fact, during his testimony, Dr. Smock disclaimed any opinion as to the direction Gorman was facing and whether she was moving forward at the time of the accident.  These photographs did not mislead the jury.  Gorman's objection addresses the evidentiary weight of the photographs, but not their admissibility.  Consequently, we hold that the photographs were admissible under the Kentucky Rules of Evidence and the trial court did not abuse its discretion in allowing Dr. Smock to use the photographs during his testimony.  By not receiving the photographs as evidence to be taken to the jury room,[33] but allowing them to be used for

24.  KRE 104.

25.  KRE 901.

26.  R. Lawson, supra at 599.

27.  *Id.* at 598; KRE 901(b)(1).

28.  KRE 401.

29.  3 Wigmore, Evidence 237 (Chadburn rev. 1970).

30.  KRE 403.

31.  *Tumey*, supra at 204.

32.  3 Wigmore, Evidence 238 (Chadburn rev. 1970).

33.  In criminal cases, "[u]pon retiring for deliberation the jury may take all papers and other things received as evidence in the case."  RCr 9.72.  The former Civil Code of Practice § 321 provided:

> After the jury have retired for deliberation, if there be a disagreement between them as to any part of the testimony, or if they desire to be informed as to any point of law arising in the case, they may request the officer to conduct them into court, where the information required shall be given in the presence of, or after notice to, the parties or their counsel.

Based on this section, our predecessor court held that the jury ordinarily should not be permitted to have exhibits in the jury room, *Security Finance Co. v. A.L. Cook & Son*, 223 Ky. 124, 3 S.W.2d 187 (1928); *Williams v. Watson*, 207 Ky. 256, 268 S.W. 1067 (1925); *Watson's Ex'r v. Watson*, 137 Ky. 25, 121 S.W. 626 (1909), but has also held that "the trial judge has broad discretion in the matter of allowing the jury to take papers introduced in

demonstrative purposes only, the trial court properly exercised its discretion to prevent the jury from giving any undue weight to Dr. Smock's testimony as a result of the photographs.

## IV. DR. SMOCK'S TESTIMONY

█ Gorman argues that Dr. Smock was not qualified to give his opinion as to the point of impact. We disagree. Although Dr. Smock testified that he does not consider himself an accident reconstructionist, his "knowledge, skill, experience, training [and] education"[34] sufficiently demonstrate his qualifications to testify in this regard. Dr. Smock has completed three years in residency in emergency medicine and a one year fellowship in forensic medicine. He serves as both an assistant professor of emergency medicine at the University of Louisville and an emergency physician at the University of Louisville Hospital. Dr. Smock has worked with the Kentucky Medical Examiner's Office and the Jefferson County Coroner's Office for eleven years. While working on his master's thesis prior to medical school, he did a study of motor vehicle accident deaths over an eighteen-month period. As part of this study, he would go to the scene of fatal motor vehicle accidents, examine the scene and help the police collect evidence. The study resulted in Dr. Smock creating a program known as the Fatal Accident Response Team which still goes to accident scenes involving fatalities in Jefferson County. He has made a study involving shoe scuff marks and how scuff marks interact with the roadway. He has trained Louisville and Jefferson County police officers re-

garding trace evidence, including shoe scuff marks. Additionally, Dr. Smock has attended accident reconstruction courses at Northwestern University and the University of North Florida. Clearly, the trial court did not abuse its discretion in allowing Dr. Smock to testify as an expert.[35] Gorman's objection to Dr. Smock's qualifications went to the weight of his testimony.

█ Dr. Smock based his opinion of Gorman's position relative to Hunt's vehicle at the time of impact in large part on a scuff mark in the highway allegedly left by Gorman's shoe. Gorman complains that Dr. Smock did not personally observe the scuff mark or view a photograph of it but that he relied on the testimony of an investigating officer. Gorman therefore argues that this lack of personal observation by Dr. Smock precluded him from testifying as to the point of impact. Again, we disagree. An expert may express an opinion based upon evidence furnished by a third party "[i]f of a type reasonably relied upon by experts in the particular field in forming opinions or inferences on the subject . . . ."[36] Here, Dr. Smock based his opinion upon information from a police officer who had investigated the accident, and we believe that it was reasonable for him to do so. We also note that this officer had already testified at trial before Hunt called Dr. Smock to the stand, and Gorman had every opportunity to cross-examine the officer regarding the scuff mark. Accordingly, the trial court did not abuse its discretion in allowing Dr. Smock to rely upon this information in expressing his opinion.

---

evidence, models, and pleadings, to the jury room while considering its verdict." *Williams v. Watson, supra* at 1069. The Kentucky Rules of Civil Procedure do not address this matter, but the prevailing practice in trial courts in civil cases is not only to permit, but, without a request from the jury, to send exhibits back to the jury room when the jury begins its deliberations.

**34.** KRE 702.

**35.** *Ford v. Commonwealth,* Ky., 665 S.W.2d 304 (1984); *Commonwealth v. Rose,* Ky., 725 S.W.2d 588 (1987).

**36.** KRE 703; see also *Buckler v. Commonwealth,* Ky., 541 S.W.2d 935 (1976) (which formerly restricted the data or information to that on which the expert would *customarily rely.*)

## V. ADVANCE LIFE SUPPORT REPORT

 Officer James Denton, an accident reconstructionist, posited that Hunt's vehicle was not traveling more than fifty miles per hour at the time of impact. On cross-examination, Gorman sought to impeach Officer Denton's testimony by introducing the Jefferson County Advanced Life Support (ALS) run report into evidence for the purpose of showing the speed of Hunt's vehicle. An EMS technician prepared the ALS run report, which was contained in the police investigation file, and included the statement, "Struck by auto traveling 50+ mph according to bystander." The trial court sustained Hunt's objection to the report's admission. Gorman claims, however, that the report was admissible as a business record. We disagree. The business records exception requires that the record be made "by, or from information transmitted by, a person with knowledge ...."[37] "Thus, a showing of 'personal knowledge' is a part of the foundation for business records and an essential element of the exception that allows such evidence to be admitted as hearsay."[38] The statement in the report by the unidentified "bystander" does not satisfy the requirement of "personal knowledge" and the trial court did not abuse its discretion in denying its introduction into evidence under the business records exception.

## VI. DIRECTED VERDICT

 Finally, Gorman argues that the trial court should have granted her a directed verdict on the limited issue of Hunt's liability. Again, we must disagree. In reviewing a judgment based upon a jury verdict, "[a]ll evidence which favors the prevailing party must be taken as true and ... credibility or the weight which should be given to the evidence ... [are] functions reserved to the trier of fact."[39] Additionally, [t]he prevailing party is entitled to all reasonable inferences which may be drawn from the evidence."[40] Whether Hunt's failure to see Gorman until immediately prior to the accident was a substantial factor in causing the accident was properly a decision for the jury. Based on the evidence, the jury could reasonably have found that Hunt kept a proper lookout but Gorman suddenly darted in front of him and that he, therefore, did not have sufficient time to react before hitting her. For the same reason, even if Hunt violated his duty not to follow too closely the vehicle in front of him, the jury could have reasonably concluded that such violation did not constitute a substantial factor, or any factor, in causing the accident.

For the foregoing reasons, we affirm the decision of the Court of Appeals.

All concur.

37. KRE 803(6).

38. R. Lawson, The Kentucky Evidence Law Handbook § 8.65 IV, at 464 (3d ed. Michie 1993)

39. *Lewis v. Bledsoe Surface Mining Co.,* Ky., 798 S.W.2d 459, 461 (1990).

