Joshua McINTIRE, Appellant,

v.

COMMONWEALTH of Kentucky,
Appellee.

No. 2003–SC–0444–MR.

Supreme Court of Kentucky.

April 20, 2006.

As Modified June 15, 2006.

Case Ordered Published by
Supreme Court June 15, 2006.

Donna L. Boyce, Appellate Branch Manager, Thomas M. Ransdell, Assistant Public Advocate, Frankfort, KY, for Appellant.

Gregory D. Stumbo, Attorney General of Kentucky, Susan Roncarti Lenz, Assistant Attorney General, Frankfort, KY, for Appellee.

Opinion of the Court by Justice JOHNSTONE.

Appellant, Joshua McIntire, was convicted of complicity to murder and first-degree criminal abuse in the Bourbon Circuit Court and received a sentence of twenty years' imprisonment for complicity to murder and ten years for criminal abuse, to be served concurrently. His appeal comes before this Court as a matter of right. Ky. Const. § 110(2)(b). Appellant asserts the following errors: 1) the improper amendment of the indictment, 2) the improper admission of expert testimony, and 3) insufficiency of the evidence. Because we find that the trial court erred in admitting expert testimony, we reverse the judgment.

The charges underlying this matter concern the abuse and death of Appellant's four-month-old son, Jordan. A particularly detailed recitation of the facts is necessary to this opinion.

In early 2001, Appellant began a relationship with Chantal Roach. He left his pregnant girlfriend in Ohio and moved in with Roach's family in Bourbon County, Kentucky. Soon, Roach was pregnant and their son, Jordan, was born on October 9, 2001. About three weeks after Jordan was born, Appellant and Roach rented their own apartment despite the fact that neither was employed. The baby was healthy and growing normally at this time; routine "well-baby" check-ups in October and November revealed no problems.

In the weeks following the move to the new apartment, family members began to notice bruises and burn marks on the baby. Teresa Edgington, Roach's mother, noticed a bruise above Jordan's eyebrow in December. Edgington testified that Appellant told her the baby had injured himself in the bassinette. Another bruise on his leg appeared later; Roach testified that she believed a tight seam in the

baby's pajamas caused this bruise. Appellant apparently became concerned about Jordan during this time also. In fact, Appellant confronted Edgington and her husband because he suspected that they were abusing Jordan.

Shortly thereafter, Roach informed her mother that Jordan had a new injury—a black eye and blood in his eye. When Edgington saw the baby later, she also noticed that he had a burn mark on his left back shoulder. Appellant and Roach both claimed that the black eye occurred when a candle accidentally fell from above and hit the baby. Edgington, however, was suspicious and took photographs of the baby's injuries.

Social services was notified of the bruise above Jordan's eye on December 28 and, later that same day, social worker Betsy Dailey visited the apartment. Along with Edgington, Dailey took photographs of Jordan and examined him head to toe for additional bruising; they found none. Roach told Dailey that a candle had fallen from the wall and hit the baby. Dailey recommended that Roach take the baby to the emergency room for evaluation. Finding no indications of abuse, she took no further action and listed the claim as unsubstantiated.

Roach took Jordan to the emergency room the same day. Dr. Michael Chestnut examined Jordan's bruise, which Roach told him was the result of an object falling onto the baby. Dr. Chestnut further testified that, aside from the bruise, Jordan appeared normal and healthy, and that he did not detect other signs of abuse. Nevertheless, because social services had recommended the ER visit, Dr. Chestnut ordered a follow-up visit with Jordan's regular pediatrician, Dr. Don Stephens. Dr. Stephens examined Jordan the next day but did not detect any abnormality aside from the bruise. Because Roach told Dr. Stephens that she thought the baby bruised easily, a blood count was ordered. That test was performed in late January and returned normal results.

Meanwhile, beginning in January, Roach and Appellant began participating in the "HANDS" program for first-time parents. Social worker Francesca Mendoza was assigned to Jordan, and made three visits to the home prior to Jordan's death. Mendoza's reports and testimony indicate that she found Appellant and Roach to be interested, though uninformed, parents. She cautioned them about smoking in the house and putting the baby to bed on its stomach. Mendoza did, however, notice the small bruise on Jordan and that he had an unusual cry. Mendoza's final report indicated her intent to keep her "eyes open" for further signs of abuse or neglect.

Jordan visited the emergency room again in mid-January for vomiting. Dr. Robert Biddle attended to Jordan and conducted a thorough evaluation of the baby. Dr. Biddle found no abnormalities other than a small, linear contusion to Jordan's elbow. Though Dr. Biddle testified that such a bruise is unusual for a non-perambulatory child, he also testified that he saw no signs of abuse and that he was not suspicious of abuse. Pursuant to Dr. Biddle's orders, Roach returned the next day to the emergency room and was seen by Dr. Chestnut. Dr. Chestnut testified that Jordan seemed healthy at that time and that he had no other concerns or observations about the child. Roach testified that, at the insistence of her mother, she also alerted Dr. Chestnut that Jordan's eyes had been crossing "quite a bit." According to Roach, she was told that this was a normal, temporary reaction to the vomiting. (It should be noted that Roach attributed this advice to Dr. Stephens during her testimony; the doctors' records, how-

ever, indicate that Dr. Chestnut performed the follow-up visit on Jordan.)

On February 6, 2002, Roach took Jordan to Edgington's house for a visit; Edgington testified that Jordan seemed normal and healthy at that time. Later, Roach's cousin, Kindra O'Neal, visited the couple at their apartment. Appellant was smoking marijuana that evening, and Roach complained that she was not feeling well. O'Neal offered to keep Jordan for the night, but Roach declined.

Roach testified that she put Jordan to bed at midnight that evening. Both she and Joshua testified that it was ordinary for Appellant to wake with the baby during the night, and for Roach to tend to the baby in the morning. Roach testified that she woke the next day, February 7, at 1:45 in the afternoon. After Appellant indicated to her that he had not been up with the baby during the night, Roach checked on the baby. He was asleep and breathing, so she and Appellant left the baby and went into the living room. At 3:30, she heard Jordan sigh over the baby monitor, so she went into the bedroom to check on him. He was limp and wet, and would not wake up. Appellant's testimony corroborated Roach's version of events.

Appellant went to a neighbor's apartment to use the phone, but was unable to reach Roach's mother. Though the neighbor offered to drive them to the hospital, Roach insisted on waiting for her mother. An hour later, Appellant was finally able to reach Edgington, who came to the apartment and took them to the hospital. Jordan was in critical condition when he arrived at the hospital at 5:45 p.m. Dr. Biddle found significant trauma about the head including bruising and swelling. Due to the gravity of Jordan's condition, he was transferred by helicopter to Kosair Children's Hospital in Louisville. Further tests confirmed that Jordan had suffered

several skull fractures as well as bleeding in the brain and a broken right arm. The next day, a pediatric ophthalmologist examined Jordan and discovered the full extent of his injuries including healed rib fractures, a leg fracture, new brain bleeding, retinal hemorrhaging, a split retina, and damage to the brain stem. The ophthalmologist concluded that these injuries were the result of non-accidental trauma consistent with shaking the infant. At trial, Dr. Biddle opined that Jordan's injuries occurred a "short timeframe prior to his arrival at the emergency room."

Detective Steve Auvenshire interviewed Appellant and Roach at the hospital. He testified that neither Appellant nor Roach had an explanation for the fifteen-hour period between putting Jordan to bed and finding him limp the next afternoon. The next day, Appellant and Roach were both arrested and charged with first-degree criminal abuse. Detective Tim Lane executed a search warrant at their apartment and obtained statements from both Appellant and Roach. Though Appellant's statement consisted of the same facts he had previously told Detective Auvenshire, Roach's statement included her admission that, the evening before Jordan was taken to the hospital, she had accidentally bumped him in the head with a telephone "pretty hard." Tragically, Jordan did not survive the abuse and died on February 13, 2002, in Louisville. He was only four months old. Appellant and Roach were then charged with his murder.

Appellant and Roach were brought to trial as co-defendants on March 17, 2002. In addition to the testimony thus far detailed, Roach's cellmates and family members of both Roach and Appellant testified. Several of Roach's cellmates testified that Roach had admitted that she would sometimes shake the baby upside down because he cried too much, and that she had used

Zanax and marijuana the night that Jordan sustained his fatal injuries. Carma Pollard, Appellant's aunt, testified that, on one occasion, she had seen Roach shaking the baby when he cried. Sabrina Campbell, Roach's aunt, testified that she had once seen Appellant mishandle the baby by not supporting his head adequately, which resulted in Jordan bumping his head against the wooden armrest of a couch. Both co-defendants testified that they believed the other had inflicted Jordan's injuries.

The jury found Roach guilty of murder and Appellant guilty of complicity to murder. Both were found guilty of first-degree criminal abuse. Appellant was sentenced to twenty years on the complicity to murder charge, and ten years on the criminal abuse charge, to be run concurrently. Roach was sentenced to forty years on the murder charge, and ten years on the criminal abuse charge, to be run consecutively. Her conviction was affirmed by this Court in *Roach v. Commonwealth*, 2005 WL 2044532 (Ky.2005). This appeal followed. Because we believe it is dispositive of the case, we address only Appellant's arguments concerning the admission of expert testimony. Additional facts will be developed as necessary.

Appellant argues that the trial court abused its discretion by permitting improper and highly prejudicial expert testimony. Dr. Betty Spevak testified for the Commonwealth in her capacity as a forensic pediatrician. Appellant objects to two portions of Dr. Spevak's testimony: (1) Dr. Spevak's statement that the injuries sustained by Jordan would have been noisy and loud; and (2) Dr. Spevak's conclusion that a non-abusing parent would be aware of abuse occurring in the home. Appellant does not argue that Dr. Spevak was generally unqualified to testify as an expert. Rather, she contends that these state-

ments exceeded the scope of her expertise and should have been excluded. The allegations of error were preserved by defense counsel's numerous objections during Dr. Spevak's testimony.

Appellant objects to statements made by Dr. Spevak during both her direct examination and her cross-examination by Roach's counsel. We begin with the statements occurring during direct examination, which followed Dr. Spevak's testimony that Jordan's injuries occurred during "a minute or two of very sustained, high level violence":

COM: The impact we're talking about of the head to a flat surface, and the type of force you are talking about. I take it this is going to be somewhat noisy.

Dr. Spevak: It's going to be very noisy. It's going to be very noisy. It's, you know, when you hear something drop in a small apartment, even in a fairly big house, you can hear it rooms away. This is something smashing into a wall or a table—

Appellant: Your Honor—

Dr. Spevak:—or a coffee table, or the floor.

Appellant: May we approach?

A discussion was held at the bench at which defense counsel argued that Dr. Spevak was not qualified to testify as to "what decibel level there is, or whether you would hear it in a small area." The objection was overruled, and the request for an admonition was denied.

Later, during cross-examination by Roach's counsel, Dr. Spevak is questioned about what signs of abuse would have been outwardly apparent:

Roach: Okay. Now you know, obviously you're a professional and know what to look for, and in this case we have medical doctors that apparently didn't,

or didn't see what they needed to see. Assuming Chantal did not do anything to hurt her baby, what do you expect a nineteen-year-old girl with a 12th grade education to see that would indicate that something was happening to her child?

Dr. Spevak: I think a nineteen-year-old girl who has been living in the household where these happened, would be aware that there were problems involving this baby.

Roach: What would you want her to see?

Dr. Spevak: I would want her to see, if she wasn't the person inflicting it, I would want her to know that the other person in the household was, and to intervene.

Roach: Now, you're talking about the bruise to the eye and the bruise to the arm, those two things? Because those are the only two things that she could have seen.

Dr. Spevak: Well, she certainly could hear the screaming of the baby as the ribs were being broken and as the arm was being broken if that didn't happen on an unconscious child at a time when those parents were there. She could have heard the child's head smashing into whatever flat, rigid object that caused the skull fractures and intervened and sought immediate medical care for the child at that time, even though that might still have been too late. Living in the same household twenty-four hours a day with that baby and the only other person who was in frequent contact with that baby in a small apartment, I would expect that she would be very aware of what was going on.

Roach: What if she didn't hear any screams, or if the only bruises she ever saw was this one on the eye and another little one on the arm, what do you expect her to see? If she didn't see those things?

Dr. Spevak: I expect her to see the interactions. I'm sorry, you're not. . . .

Roach: You don't think. . . .

Dr. Spevak: I have spoken to many people and many children who live in households where the child is not. . . .

Appellant: Your Honor, I object.

After a lengthy bench conference, at which Appellant's counsel again argued that Dr. Spevak was exceeding the scope of her expertise, the trial court overruled the objection.

Dr. Spevak: In the course of my practice, I have the opportunity to interview many parents and many children in homes where there is domestic violence. I have had many parents tell me they don't think the children know or have ever seen it. I can't think of a child who is school age who lives in a household like that who has denied to me that he's seen his mother hit, or her mother hit. I think in a small household, in a violent household. . . .

Appellant: Your Honor.

Dr. Spevak: I think the people who are living in the household. . . .

Appellant: Your Honor, I do want to approach.

The Court: I have overruled your objection, now let her finish her answer and then we'll move on. Go ahead.

Dr. Spevak: I think that people living in that household are aware that there is violence or danger. Whether they know of every specific incident is dependent upon whether they are in the house at the time. But they know that there is violence going on in the household.

Roach: But if Chantal or Josh didn't know, if there was no violence between them and if they didn't hear anything violent with anybody else, how were they supposed to know?

Dr. Spevak: I'm sorry, did....

Roach: There's no evidence of domestic violence in....

Dr. Spevak: Did the evil fairy come in and inflict these injuries?

Appellant: I'm sorry....

The Court: Answer the question. You don't get to ask questions.

Dr. Spevak: I'm sorry. I apologize.

The Court: You only get to answer questions if you know, or you don't know.

Roach: What evidence of domestic violence, Doctor, are you aware of in this household?

Dr. Spevak: I am not, I am unaware of any evidence of domestic violence in this household.

KRE 702 governs the admissibility of expert opinion testimony. To introduce expert opinion testimony, a four-part test must be satisfied. *Stringer v. Commonwealth,* 956 S.W.2d 883, 891 (Ky.1997). First, the witness must be qualified to render an opinion on the subject matter. Second, the subject matter must satisfy the requirements of *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Third, the subject matter must satisfy the test of relevancy set forth in KRE 401, subject to the prejudicial versus probative balancing test required by KRE 403. Finally, the opinion testimony must assist the trier of fact. We reiterate that decisions concerning the admissibility and qualifications of an expert witness rest within the sound discretion of the trial court. *Ford v. Commonwealth,* 665 S.W.2d 304, 309 (Ky.1983), *cert. denied,*

469 U.S. 984, 105 S.Ct. 392, 83 L.Ed.2d 325 (1984). A trial judge abuses his or her discretion when a decision is "arbitrary, unreasonable, unfair or unsupported by sound legal principles." *Farmland Mut. Ins. Co. v. Johnson,* 36 S.W.3d 368, 378 (Ky.2000). Upon thorough review of the record, we conclude that the trial court erred in admitting certain portions of Dr. Spevak's testimony, as its prejudicial effect was far outweighed by its probative value.

At the outset of her testimony, Dr. Spevak explained that she was a forensic pediatrician employed by the Medical Examiner's Office's Living Forensics Program, and described herself as a "child abuse specialist." She indicated that her work involves not only autopsies of deceased children, but also work with living victims of child abuse. Though she did not state her education for the record, Dr. Spevak did recite an impressive list of publications, all of which concerned the "interpretation of injuries in dead children" and the "mechanisms of injury, of how injuries happen in children." Clearly, Dr. Spevak was qualified to testify as to the mechanics and causation of Jordan's injuries. Accordingly, the bulk of Dr. Spevak's testimony on direct examination concerned the extent of Jordan's injuries, the most common injuries sustained by abused children, the force necessary to inflict Jordan's injuries, and her professional opinion as to whether the injuries were accidental.

■ Turning to Appellant's first objection to Dr. Spevak's testimony, we note that neither party herein argues that Dr. Spevak was unqualified to testify as to the force required to sustain the types of injuries inflicted upon Jordan. Appellant objects only to her conclusion that the impact would have been noisy. We find this determination to be nothing more than a common sense conclusion based on the evidence. Dr. Spevak did not testify as to a

particular decibel range, only that the sound would be "very noisy." She did not testify as to whether anyone actually heard the noise; she simply stated that it would be loud because there was something striking against a hard surface. In *Gorman v. Hunt*, 19 S.W.3d 662 (Ky.2000), we found no error in the admission of a doctor's opinion testimony on the force and impact sustained by a pedestrian struck by an automobile despite the fact that the doctor was admittedly not an expert in accident reconstruction. We reasoned that the doctor's experience and education with regard to emergency medicine and traffic accidents qualified him to testify on matters involving impact and the force of injuries. *Id.* at 670. Here, Dr. Spevak has extensive experience regarding the physical aspects of child abuse and was qualified to testify as to the type of impact required to inflict the injuries to Jordan. The objection to Dr. Spevak's testimony went more toward the weight of her testimony rather than its admissibility. There was no abuse of discretion.

■ We find error, however, in allowing Dr. Spevak to testify that a non-abusing parent would be aware that his or her child was being abused. Though she had been asked three times what Roach would have *seen* of Jordan's injuries, Dr. Spevak was permitted to respond, in essence, that a non-abusing parent is always aware of violence in the household. As the basis for this opinion, she cited her interviews with "many parents and many children in homes where there is domestic violence." Presumably by way of analogy, Dr. Spevak was then permitted to explain that parents often do not think their children are aware of violence in the household, but that she could not recall any school-age child who would deny this knowledge. She went on to opine that "people living in that household are aware that there is violence or danger," and that "they know there is violence going on in the household" even if they do not "know of every specific incident."

This testimony fails several prongs of the *Stringer* analysis. First, the reliability standard set forth in *Daubert* requires a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93, 113 S.Ct. 2786. No such analysis occurred with respect to this portion of Dr. Spevak's testimony, though defense counsel twice requested a brief hearing on the matter prior to the continuation of her testimony, specifically questioning the scientific basis of her testimony. Thus Dr. Spevak was permitted to state the sole basis of her opinion that Roach would necessarily know that Jordan was being abused: her interviews with "many parents and many children in homes where there is domestic violence." By her own admission, these interviews were with "school-age children." An impression gleaned from interviews with school-age children living in homes where violence exists between the parents is simply insufficient to base an opinion that a parent would necessarily be aware that the other parent was abusing a four-month-old infant. Nor did Dr. Spevak indicate how many parents and children had been interviewed, any additional findings from these interviews, or any comprehensive report of the findings. In short, there was no demonstrated scientific basis for this opinion testimony.

■ Also, there was insufficient evidence to support a finding that Dr. Spevak was qualified to render this type of opinion testimony. Clearly, Dr. Spevak holds impressive qualifications and has extensive experience in the field of forensic pedia-

trics, which she described as the overlapping of "pediatrics and law." However, the experience and training referenced by Dr. Spevak concerned the mechanics and interpretation of injuries in children—in other words, the medical and physical aspects of child abuse. There is no indication in the record that Dr. Spevak has any extensive training or experience in psychology, psychiatry, or a similar field that would typically qualify a person to render an opinion about the psychological aspects of child abuse or, more specifically, the behavioral patterns of abusing parents. Without evidence to the contrary, it cannot be assumed that an expertise in forensic pediatric medicine, even when concentrated in child abuse victims, necessarily includes expertise in psychology or other fields related to domestic relations. "Essential fairness in a trial requires that the trial court carefully scrutinize the qualifications and the testimony of the [expert] before permitting his opinion testimony to be submitted to a jury." *Alexander v. Swearer*, 642 S.W.2d 896, 897 (Ky.1982). Again, it cannot be overlooked that defense counsel twice asked the trial court for a brief hearing on Dr. Spevak's qualifications to render this type of testimony, arguing that her "expertise is limited to medical practice."

■ Furthermore, any probative value of this testimony is far outweighed by its prejudicial effect. That school-age children are aware when violence is occurring between their parents is simply not probative of whether a parent is aware that another member of the household is abusing an infant, and is therefore irrelevant. KRE 401. Furthermore, expert testimony was not needed for the jury to determine whether Appellant or Roach would have known that the other was abusing Jordan; the jury was well aware of the family's living arrangements and typical daily schedules. The common juror would easily understand this evidence and draw reasonable inferences therefrom concerning Appellant's knowledge. This area of inquiry is not, then, the proper subject of expert opinion. Therefore, Dr. Spevak's belief is little more than a personal conclusion based on her conversations with domestic violence victims, not an opinion based on her personal perceptions of Appellant and Roach. *See* KRE 701(a). The prejudicial effect of this testimony is great, however, because it did not constitute an expert opinion, but was delivered as such to the jury.

■ For these reasons, the trial court abused its discretion in admitting the aforementioned portions of Dr. Spevak's testimony. Errors in the admission of evidence do not warrant reversal if they are harmless; that is, if the substantial rights of the parties have not been affected. RCr 9.24. If, upon consideration of the entire case, there is not a substantial possibility that the result would have been any different, then an error is not prejudicial and does not warrant reversal. *Abernathy v. Commonwealth*, 439 S.W.2d 949, 952 (Ky. 1969). After an extensive review of the trial record, we are unable to conclude that the admission of Dr. Spevak's testimony was harmless error.

It is the weight of the evidence that prevents us from deeming this error harmless. *See Abernathy* at 953. ("Necessarily, one important circumstance in determining whether a particular error was prejudicial is the weight of the evidence.") The jury instructions on first-degree criminal abuse required a finding that Appellant "had custody of Jordan McIntire and intentionally permitted him to be abused by Chantal Roach." The jury instructions on complicity to murder required a finding that Appellant "failed to make a proper effort to prevent Chantal Roach from caus-

ing the death of Jordan McIntire." Implicit in these intent requirements is the necessity that Appellant was aware that Roach was abusing the baby. Accordingly, Appellant's defense theory was that Roach had abused and killed Jordan unbeknownst to him.

The evidence against Appellant was overwhelmingly circumstantial. Of the twenty-eight witnesses who appeared at trial, only one testified that she had personally seen any inappropriate behavior by Appellant towards the baby. Sabrina Campbell, Roach's aunt, testified that she had observed Appellant rocking the baby, and that he was not properly supporting Jordan's head which resulted in him bumping the wooden armrest of a sofa. While Roach's uncle testified that he had once heard the baby let out a distressed cry as Appellant held him, he also acknowledged that he only heard this cry and did not visually witness Appellant abusing or mishandling the baby. Neither of these incidents is particularly damning, nor do they establish that Appellant was aware that Roach was abusing the child. And though social workers and several of Roach's relatives testified that they questioned whether the baby was being abused due to the bruises appearing on the small child, none ever personally observed Appellant shake, strike, or abuse the child in any way. An aunt of Appellant, Carma Pollard, was the only person to witness Roach shaking the baby on one occasion. According to her own testimony, she did not inform Appellant of this incident.

We acknowledge the import of the two defendants' living arrangements. The fact that the two shared a small apartment together with their baby and were usually together is an extremely persuasive piece of circumstantial evidence from which the jury surely drew very damaging conclusions. Also, Appellant testified that he suspected that the Edgingtons might have abused Jordan, and even confronted them several months before Jordan's death. Therefore, the jury could have believed that Appellant was aware that someone was abusing the baby.

But, this testimony must be considered in light of Jordan's subsequent medical history. Based on the evidence, the jury could have concluded that Jordan was abused as early as December (when Teresa Edgington noticed a bruise above the baby's eye, and when Appellant confronted the Edgingtons). Between December and his death, Jordan was seen by three pediatricians. None suspected or reported abuse, even though social services had recommended one of the doctor visits. Ms. Dailey, a social worker, visited Jordan during this period and concluded that the claim of abuse was unsubstantiated. Ms. Mendoza, another social worker, suspected that something might be amiss with Jordan, but was not so convinced that the child was being abused as to take more direct action. She simply noted her personal intention to keep her eyes open. In short, five professionals visited with Jordan or physically examined him during the period of his abuse and none detected the crime or suggested that the child was being abused.

In the absence of any other piece of direct evidence indicating that Appellant was aware that Roach was abusing the baby, especially when weighed against Jordan's medical history, we simply cannot conclude that Dr. Spevak's remarks were harmless. Appellant's knowledge that Roach was abusing Jordan was essential to both charges. It is impossible to speculate what importance the jury placed on the testimony of a medical expert that the nonabusing parent will always be aware of abuse. Furthermore, the attitude and tone of her responses cannot be over-

looked. When a medical expert sarcastically asks defense counsel if "the evil fairy" abused the child, the only impression given is that it would be utterly outrageous or unfathomable that the parent would *not* be aware of the abuse. Finally, we reiterate that Dr. Spevak's comment was the single piece of direct evidence that Appellant was aware that Roach was abusing the child.

Having found that the trial court erred in admitting these portions of Dr. Spevak's testimony, we conclude that this error was not harmless. There was virtually no direct evidence of Appellant's knowledge that Jordan was being abused, and the circumstantial evidence did not unequivocally point towards guilt or innocence. In short, we believe that Dr. Spevak's testimony might have greatly influenced the jury, and there is a substantial possibility that the verdict might have been different absent this testimony.

The judgment of the Bourbon Circuit Court is therefore reversed and this case is remanded to the trial court for further proceedings consistent with this opinion.

LAMBERT, C.J.; COOPER, JOHNSTONE, and SCOTT, JJ., concur.

ROACH, J., dissents by separate opinion, with GRAVES and WINTERSHEIMER, JJ., joining that dissent.

Dissenting opinion by Justice ROACH

I agree with the majority's conclusion that the trial court committed error in allowing Dr. Spevak to testify that a non-abusing parent would be aware that his or her child was being abused. However, after reviewing the trial testimony, I believe that the error was harmless.

It is important to note that the testimony at issue was not elicited by the Commonwealth, nor was it mentioned by the Commonwealth in its closing argument. Although not dispositive in determining harmless error, I believe these facts—that the Commonwealth did not elicit the testimony and that the Commonwealth declined to refer to it in its closing argument—are necessary to place the evidence in its appropriate context.

As stated by the majority, in order to conclude that the Appellant was guilty of complicity to murder, the jury was required to find that Appellant "failed to make a proper effort to prevent Chantal Roach from causing the death of Jordan McIntire." A review of the record reveals both that there was an abundance of proof beyond Dr. Spevak's improper testimony to support the jury's finding and that the error at issue was harmless:

(1) The two defendants lived in a small apartment—described by one witness as less than half the size of the court room where the trial was held—where they were usually together with their baby.

(2) Francesco Mendoza, an employee of the Bourbon County Health Department who worked with first-time parents testified:

This is dated February 9th, it's a late entry from that visit on January 18th. "I remembered when I held Jordan I noticed a small bloodshot mark inside of his left eye. When I asked what happened, she said that she didn't know, that she had taken him to Dr. Stephens and that he had ordered blood work, and that maybe he had something wrong with his blood that caused him to bruise easily. I advised him to get the blood work done ASAP. Jordan seemed scared. As I held him to my chest he relaxed, but when I pulled him away, he started crying again. My visit time was up, so I gave him to mom and she continued to try and console him. When Jordan

began to cry, Chantal picked him up but he continued to cry after a couple of minutes. We both at the same time said, you want to hold him; let me hold him." Those were things I remembered after my home visit.

Mendoza also testified that she "felt the desperation in a baby's cry that [she] had never felt before."

(3) Cellmate Christy Abney testified that Chantal Roach told her that Jordan's crying got on her nerves. Abney then testified that Roach explained that Jordan "would cry so much that she would shake him, and that she had shook him up upside down and that he had puked from shaking him."

(4) Athena Willoughby testified that Roach told her that she took Xanax on a regular basis including "several of them the night before and the day of" February 7th. Roach also told Willoughby that the Xanax "made her meaner than hell."

(5) Teresa Edington, Roach's mother, testified that she had noticed bruises on Jordan. She also testified that when she asked the Appellant about the bruise above Jordan's eyebrow that the Appellant claimed that Jordan had received the bruise by bumping his head against the bassinet. She also testified that the Appellant explained Jordan's black eye by claiming that a candle fell off the wall and hit Jordan.

(6) Sabrina Campbell testified that two out of three times that the defendants visited her house that they were under the influence or intoxicated.

(7) Chantal Roach's aunt, Christy Roach, testified that she became so concerned about Jordan's bruises that she called social services.

(8) Teresa Feedback, another of Roach's cellmates, testified that Roach demonstrated to her what she did to Jordan: "She acted like she grabbed him by the ankles, and she popped him like a rug. She shook him like, she'd have him by the ankles and shook. That's the motion she made."

(9) Kindra O'Neal testified that on the night of February 6th she was at the defendants' apartment and that both defendants were smoking marijuana. She also testified that Appellant explained that Jordan's black eye was caused by Jordan crying so much.

(10) Dr. Burrows, an assistant medical examiner testified that Jordan's death certificate listed the contributing causes of his death as "inflicted closed head injury and battered baby syndrome."

(11) Chantal Roach testified that she and the Appellant went to bed at around midnight on February 6th and that they both woke up at 1:45 p.m. the next day. She also testified that the Appellant did not work and that she and Appellant were around each other a fair amount.

(12) Appellant testified that although he was a hard sleeper that he could hear his child cry at night because "[i]t's different when it's your child crying." He also admitted to taking Lorcet, a prescription painkiller, on February 6th.

This evidence establishes the setting and circumstances surrounding the crime, namely that the defendants lived in a small apartment, where they were usually together with their child, where they regularly consumed illicit drugs and alcohol; that people who had contact with the couple over time, rather than single visits, observed a pattern of injuries to the child that indicated ongoing abuse; and that the act of abuse that ultimately led to the child's death was intense and violent. I believe the evidence was best summarized by the Commonwealth in its closing argument:

We've heard denials, ignorance, like they had their blinders on, ear plugs in their ears, and glasses where they couldn't see. Yet people outside the

home, who didn't have the benefit of being there, who had to go to work some days, who didn't get to be around Ms. Roach and Mr. McIntire all day long, didn't get to hear the exchanges, the arguments. Didn't get to see the frustration that either one or both of them were getting when Jordan would get a little fussy.

Were there warning signs that they should have known? Did they need a doctor to tell them? Their own family was telling them. Their own family confronted them, both of them. Something is wrong here, this child is too young to have these bruises.

You'll have the photos that Chantal Roach's mother took that showed the burn mark, or what they believed was a burn mark. It shows other bruises. We heard of candles falling off the walls, bruises from bassinets, bruises from pajamas, bruises from rocking, bruises from bouncing, bruises from sucking his thumb, didn't he hit his head at your houses bruises, crying so hard his eyes turned black bruises, accidentally hitting him with the telephone. He didn't bruise himself sucking his thumb. Dr. Chesnut got the referral that required a mandatory visit the next day to Dr. Stephens. It was a bruise on the temple and a bruise on the eye. It must have been a magic candle falling off the wall twice. *I think that's the trip that Josh made to the doctor when Chantal told Dr. Chesnut it happened rocking him, or bouncing him. She told Dr. Stephens it happened rocking him, when the original statement had been that a candle fell off the wall. They were together then. Did he go, "Now wait a minute, wait a minute, that's not how that bruise happened. You didn't do that rocking him, a candle fell off the wall."? No. After they left the office, "What are you talking about? The candle fell, you didn't do that rocking, you didn't do*

*that bouncing."? He made both trips.* They weren't taking him to the doctor for the bruises. They took him because they had to, there had been a report to Social Services.

Doctors see bruises on this child even when that's not why he's taken. He was taken for vomiting. Dr. Biddle pointed out, well, he's got two linear contusions. I don't know what excuse was given. I don't remember an excuse for the handprint on the leg. I don't remember the excuse for the one on the shoulder.

No, they didn't need a doctor to tell them. They knew what was going on inside their own home. There's people out at the jail that know what was going on inside their own home. It wasn't hidden from anybody. Drug use on a regular basis, so much so that we refer to taking a pill as eating it. You're taking a lot of pills when you switch from swallowing or having to take medicine to eating it.

(Emphasis added).

The Commonwealth made an unassailable point in closing. Appellant had told third parties one story of how Jordan's injuries had occurred and then sat silently while Chantal Roach told the doctor a different story. In addition, the Commonwealth did not need an expert to convince the jury that a non-working spouse who sat around a small apartment all day, each and every day, would have known of the horrific abuse perpetrated against his baby. Based on the evidence at trial, any error that occurred in Dr. Spevak's testimony was harmless. Thus, I respectfully dissent.

GRAVES and WINTERSHEIMER, JJ., join this dissenting opinion.