**David Lamar HAMILTON, IV, Appellant,**

v.

**COMMONWEALTH of Kentucky, Appellee.**

**No. 2008–CA–000300–MR.**

Court of Appeals of Kentucky.

Aug. 14, 2009.

---

Susan Jackson Balliet, Assistant Public Advocate, Frankfort, KY, for appellant.

Jack Conway, Attorney General of Kentucky, David B. Abner, Assistant Attorney General, Frankfort, KY, for appellee.

Before MOORE and WINE, Judges; HENRY,[1] Senior Judge.

MOORE, Judge:

David Lamar Hamilton, IV, appeals from a jury verdict and judgment of the McCracken Circuit Court finding him guilty of wanton assault in the first degree and sentencing him to eleven years' imprisonment following the injury of his infant son. Because we conclude that the trial court erred in permitting certain expert testimony and that error was not harmless, we reverse and remand for a new trial.

On Sunday evening, January 8, 2006, Hamilton's infant son, D.H., suddenly started choking, had trouble breathing, and his eyes rolled back in his head. As a result, D.H. was taken by ambulance to the West Baptist Hospital emergency room in Paducah and from there to Kosair Children's Hospital in Louisville. The doctors found no external signs of trauma. Instead, they found bleeding in D.H.'s brain (subdural hematomas) and bleeding at the back of both his eyes (retinal hemorrhaging). D.H. was critically ill and required life support. After a two-week stay at Kosair, D.H. was well enough to be released and eventually made almost a total recovery.

Before D.H. was released, Hamilton stated in an interview with the police that around midnight on Saturday, January 7, 2006, he was sitting on the bed holding D.H. in his lap, feeding him and trying to burp him. D.H. suddenly kicked off of him and threw up. In response, Hamilton said that "[He] kind of yanked [D.H.] back real quick." In a second interview, Hamilton admitted that he moved D.H. back and forth while he scolded, "See what you've done. I'm going to have to give you a bath."

Hamilton told detectives it was possible he shook D.H. and admitted that at Kosairs, he spoke with the detectives about shaking D.H. According to Hamilton's trial testimony, D.H. "cried for an hour ... really loud," and "started acting crazy ... spazzing out," and then "stopped and went to sleep." At approximately 10:30 p.m. the

---

1. Senior Judge Michael L. Henry, sitting as Special Judge by assignment of the Chief Justice pursuant to Section 110(5)(b) of the Kentucky Constitution and KRS 21.580.

following Sunday, D.H. suddenly started choking on his food, turning blue, and losing consciousness.

A McCracken County Grand Jury indicted Hamilton on one count of Wanton First–Degree Assault. The Commonwealth sought to introduce evidence and expert testimony regarding "Shaken Baby Syndrome" (SBS) to prove that shaking caused D.H.'s subdural hematomas and retinal hemorrhaging. In response, Hamilton moved for a pretrial hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), to assess the reliability of SBS before allowing the Commonwealth to adduce it at trial. In support of his motion, Hamilton attached as exhibits articles from several medical journals questioning the reliability of the methodology behind the SBS theory. Hamilton subsequently renewed his motion and submitted an affidavit of George R. Nichols, II, M.D., which also questioned the methodology of SBS.

The Commonwealth opposed Hamilton's motion, generally citing to cases from other states where evidence of SBS has been admitted into evidence. The Commonwealth's response also included: (1) a two-page discharge summary of Jeffrey T. Grill, M.D., which states in relevant part that the admitting diagnosis was acute and chronic subdural hemorrhages, due to "nonaccidental" trauma; and (2) the four-page clinical forensic medicine examination report of Betty Spivack, M.D., which includes her three-sentence impression that the subdural hemorrhages were caused by rotational events, including shaking and being thrown.

The trial court held a pre-trial conference to discuss the necessity of a *Daubert* hearing, approximately two weeks before

the trial date. Pursuant to a verbal order and over Hamilton's objection, the trial court decided not to hold a *Daubert* hearing and instead allowed the Commonwealth to introduce evidence of SBS before the jury.

At trial, the Commonwealth defined SBS for the jury in its opening statement as a widely-recognized and accepted medical diagnosis, consisting of subdural hematomas and retinal hemorrhaging, caused by manual shaking with no visible signs of impact. To prove that shaking was the cause of D.H.'s injuries, the Commonwealth introduced four witnesses as experts on SBS, all of whom repeated the Commonwealth's definition of SBS and testified that D.H.'s injuries were indicative of SBS. These witnesses included Fred Mushkat, M.D., the head emergency room physician at Western Baptist Hospital in Paducah; David Shell, M.D., D.H.'s attending physician at birth; Jeffrey Grill, M.D., a board-certified pediatrician from Kosair; and Thomas Moriarty, M.D., an almost-board-certified[2] pediatric neurosurgeon from Kosair.

A jury found Hamilton guilty of wanton first-degree assault. Hamilton was subsequently sentenced to eleven years' imprisonment.

After the trial concluded, the trial court rendered a written opinion memorializing its earlier denial of a *Daubert* hearing, stating that its grounds for doing so included the following:

- The trial court had reviewed "a significant amount of material relating to SBS," and "conducted an independent search that yielded zero published cases where the reasoning or methodology behind the theory of SBS did not survive the *Daubert* test";
- In September of 2007, the presiding judge had attended a judicial confer-

---

**2.** This designation is not defined.

ence which included a presentation regarding opposing theories as to the scientific validity and admissibility of SBS in court proceedings;

- The trial court judicially noticed SBS because the Supreme Court of Kentucky deemed SBS "scientifically reliable" in *McIntire v. Commonwealth*, 192 S.W.3d 690 (Ky.2006);

- Because SBS has been judicially noticed as scientifically reliable, Hamilton had the burden to prove that SBS was not scientifically reliable; and

- The trial court was not satisfied that Hamilton met this burden and undertaking a *Daubert* hearing would be a waste of judicial resources.

While Hamilton raises several instances of error on appeal, we find the issue of the trial court's admission of expert testimony regarding SBS dispositive to the issue of whether error occurred.

In Hamilton's motion for a hearing, he specifically requested the trial court to assess the reliability of the experts' opinion that his son's subdural hematomas and retinal hemorrhaging were caused solely from the act of shaking. In overruling his motion, Hamilton contends that the trial court did not satisfy its gatekeeping obligations when it admitted SBS opinion evidence without first determining its reliability. We agree.

If expert opinion evidence and conclusions are based on medical symptoms, questions surrounding the reliability of such conclusions arise. As such, Kentucky Rule of Evidence (KRE) 702 imposes a special gatekeeping obligation on the trial judge to ensure that an opinion offered by an expert is reliable, *i.e.,* to conduct a *Daubert* hearing to assess its reliability. This gatekeeping obligation is set forth in *Commonwealth v. Christie*, 98 S.W.3d 485, 488–89 (Ky.2002):

When faced with a proffer of expert testimony under KRE 702, the trial judge's task is to determine whether the expert is proposing to testify to (1) scientific, technical, or other specialized knowledge that (2) will assist the trier of fact to understand or determine a fact in issue. This calls upon the trial court to assess whether the proffered testimony is both relevant and reliable. This assessment does not require a trial court to hold a hearing on the admissibility of the expert's testimony. But a trial court should only rule on the admissibility of expert testimony without first holding a hearing when the record [before it] is complete enough to measure the proffered testimony against the proper standards of reliability and relevance.

Usually, the record upon which a trial court can make an admissibility decision without a hearing will consist of the proposed expert's reports, affidavits, deposition testimony, existing precedent, and the like. Such a record is necessary in order to give a trial court an adequate basis for making its decision on the relevancy and reliability of the proposed expert's testimony and to allow for appellate review of the trial court's decision. Failure to make a determination on the admissibility of expert testimony without an adequate record is an abuse of discretion by the trial court.

*Id.* (internal quotations and citations omitted).

■ In sum, so long as the record is complete enough to measure the proffered testimony against the proper standards of reliability and relevance, a *Daubert* hearing is unnecessary. The Kentucky Supreme Court applied this reasoning to the facts in *Hyman & Armstrong, P.S.C. v. Gunderson*, 279 S.W.3d 93 (Ky.2008), in which a trial court did not provide a *Daubert* hearing after being requested to do

so. There, the Court found that the trial court's denial of such a hearing was not an abuse of discretion, in light of the following:

The trial court had before it a mountain of discovery material, including lengthy depositions of the causation experts, affidavits of the experts, reports of the experts, a voluminous amount of scientific studies, reports and publications relied on by experts, and extensive briefings by the parties. At one point, the judge remarked on the record that the pretrial record occupied an entire room in his chambers and that he had spent weeks reading the material. Further, on January 19, 2004, the court devoted an entire day to addressing the parties' motions in limine, many of which related to the admissibility of specific pieces of scientific evidence that were relied on by the [Plaintiffs'] causation experts and were challenged as being unreliable and irrelevant. The challenged evidence included case reports, adverse drug experience reports, and animal studies. Although this may not have technically been a *Daubert* hearing, the court heard lengthy arguments on the reliability and relevancy of the scientific evidence underlying the [Plaintiffs'] causation experts' opinions. We adjudge that the trial court did not abuse its discretion in its method of evaluating the reliability and relevancy of the testimony of the [Plaintiffs'] causation experts. The court had more than an adequate record before it to make its *Daubert* ruling, and it was apparent at the January 19, 2004 hearing that the trial judge was well versed on the copious record.

*Id.* at 100–101.

We acknowledge that the Supreme Court described the above-referenced circumstances as a "more than adequate" showing to justify denying a *Daubert* hear-

ing. However, *Hyman* stands in stark contrast to the case at bar. Here, when the trial court decided to admit SBS testimony and evidence and deny Hamilton the benefit of a *Daubert* hearing through its verbal order of October 25, 2007, the record contained only the following:

- Non-binding case law from jurisdictions outside of Kentucky offered by the Commonwealth;
- The two-page discharge summary of Jeffrey T. Grill, M.D., which states in relevant part that the admitting diagnosis was acute and chronic subdural hemorrhages, due to "nonaccidental" trauma;
- The four-page clinical forensic medicine examination report of Betty Spivack, M.D., which includes her three-sentence impression that the subdural hemorrhages were caused by rotational events, including shaking and being thrown;
- Articles from several medical journals, attached as exhibits to Hamilton's motion for a *Daubert* hearing, which question the reliability of the methodology behind the SBS theory;
- The affidavit of Dr. Nichols, questioning the reliability of the methodology behind the SBS theory; and
- The trial judge's statement that he went to a judicial conference and attended a presentation, the contents of which are not in the record, regarding the validity of various SBS theories.

■ In short, at the time of the trial court's verbal decision to deny Hamilton a *Daubert* hearing, the record contained few of the factors *Christie* found indicative of the "complete record" that would excuse the necessity of such a hearing (*i.e.,* the record contained no existing precedent, only two, brief, proposed reports, and no affidavits or deposition testimony from any of the Commonwealth's proffered experts).

As such, we cannot find that the record upon which the trial court justified its assessment of the reliability of the methodology of SBS, its decision to deny Hamilton a *Daubert* hearing, and admission of evidence of SBS approached the level of "completeness" *Christie* requires. Thus, in deeming SBS testimony admissible and offering this evidence to the jury before holding a *Daubert* hearing to determine its reliability, the trial court clearly erred and abused its discretion.

The Commonwealth offers two contrary arguments, both of which misinterpret the controlling law under these circumstances.

First, the Commonwealth argues that it never had any burden to prove that the methodology underlying SBS was reliable for evidentiary purposes because the trial court judicially noticed SBS and properly allocated the burden of proof onto Hamilton to show that the methodology underlying SBS was unreliable. The Commonwealth reasons that Hamilton's failure to make such a showing to the satisfaction of the trial court justified the trial court denying Hamilton's motion for a *Daubert* hearing. We disagree.

■ If a party is offering expert testimony in a field of scientific inquiry so well established that *it has been previously deemed reliable by an appellate court,* the trial court may take judicial notice of the evidence. This

> relieves the proponent of the evidence from the obligation to prove in court that which has been previously accepted as fact by the appropriate appellate court. It shifts to the opponent of the evidence the burden to prove to the satisfaction of the trial judge that such evidence is no longer deemed scientifically reliable. The proponent may either rest on the judicially noticed fact or introduce extrinsic evidence as additional support or in rebuttal.

*Johnson v. Commonwealth,* 12 S.W.3d 258, 262 (Ky.1999).

In making its determination that SBS has been previously recognized as a reliable theory in Kentucky, the trial court relied entirely upon the Kentucky Supreme Court's decision in *McIntire v. Commonwealth,* 192 S.W.3d 690 (Ky.2006). In its November 8, 2007 written order denying Hamilton a *Daubert* hearing, the trial court found that

> [t]he Kentucky Supreme Court allowed testimony as to SBS from Dr. Betty Spivak. Although the Court ultimately found that Dr. Spivak was not qualified to testify "that a non-abusing parent would be aware that his or her child was being abused" because of a lack of a *Daubert* hearing, the Court did not take any issue with her testimony as to the reliability of SBS. In finding this the Court stated:

> "Though she did not state her education for the record, Dr. Spevak (sic) did recite an impressive list of publications, all of which concerned the 'interpretation of injuries in dead children' and the 'mechanisms of injury, of how injuries happen in children.' Clearly, Dr. Spevak (sic) was qualified to testify as to the mechanics and causation of Jordan's injuries." *McIntire v. Commonwealth,* 192 S.W.3d 690, 697 (Ky.2006).

Contrary to the trial court's interpretation of *McIntire,* the theory of SBS was never deemed admissible, discussed, mentioned as *dicta,* or even referenced in that case. The facts of *McIntire* are distinguishable from the instant case and prevent such an inference. The victim in *McIntire* sustained obvious, visible injuries resulting from head trauma caused by blunt objects (*i.e.,* a telephone and a hard surface); here, there were no outward signs of injury. To prove the element of

causation, unlike in *McIntire,* the Commonwealth relied entirely upon the proposition that the telltale signs of SBS can include, and in this case must include, no outward signs of accident or trauma. In other words, there was no need to rely on SBS as a theory of causation of injury in *McIntire,* but the theory of causation in the instant case fails without it.

We are mindful that testimony regarding SBS is accepted in other jurisdictions; however, in Kentucky, such testimony has not been recognized as reliable for purposes of judicial notice.[3] As such, it was incumbent upon the Commonwealth to demonstrate the reliability of the scientific methodology underpinning SBS, and it was error for the trial court to judicially notice SBS and shift the burden to prove its unreliability onto Hamilton.

■ Because we have concluded that the trial court erred in permitting testimony and evidence regarding SBS without the requisite reliability determinations, we must decide whether that error was harmless. Kentucky Rule of Criminal Procedure (RCr) 9.24 provides that errors in the admission of evidence do not warrant reversal if they are harmless; that is, if the substantial rights of the parties have not

been affected. "[I]f upon a consideration of the whole case this court does not believe there is a substantial possibility that the result would have been any different, the irregularity will be held nonprejudicial." *Abernathy v. Commonwealth,* 439 S.W.2d 949, 952 (Ky.1969).

■ Upon review of the record, this Court concludes that the error in the admission of SBS evidence was not harmless. The jury instructions on first-degree assault required a finding that Hamilton "caused a serious physical injury to [D.H.] by shaking him." In order to prove that shaking caused D.H.'s injuries, the Commonwealth relied exclusively upon SBS testimony from four separate "SBS experts." With an absence of any other piece of direct evidence indicating that Hamilton's purported shaking caused D.H.'s retinal hemorrhaging and subdural hematomas, there is more than a substantial possibility that the verdict might have been different without this testimony.

For its second contrary argument, the Commonwealth contends that if this is error, such error is harmless because "there is no reasonable possibility that if a *Daubert* hearing was held the trial court would

**3.** *Johnson v. Commonwealth,* 12 S.W.3d 258, 262 (Ky.1999), contains a list of scientific methods and techniques which have been recognized as reliable by our courts; it includes certain types of DNA testing, breath testing to determine blood alcohol content, HLA blood typing to determine paternity, fiber analysis, ballistics analysis and fingerprint analysis. We qualify this statement by noting that the Kentucky Supreme Court has published at least one decision referencing the theory of SBS: *Dant v. Commonwealth,* 258 S.W.3d 12 (Ky.2008). *Dant,* however, is distinguishable from the case at hand and cannot serve as appellate court having judicially noticed SBS. In *Dant,* a doctor gave detailed testimony regarding SBS; specifically, the doctor stated that subdural hemorrhaging, subarachnoid hemorrhaging, and retinal hemorrhaging in the skull of a seven-month-old child, discovered upon autopsy, was caused by the fast acceleration and deceleration of the brain, or her head being thrown back and forth with great force. *Id.* at 22. There is no indication in the *Dant* opinion that the defendant requested a *Daubert* hearing; objected to the substance of the doctor's testimony referencing SBS at any point in the proceedings; or requested the Court to review the trial court's admission of the SBS testimony on the basis of palpable error. Rather, the issue before the Supreme Court regarded whether the trial court erred in allowing the Commonwealth to supplement the doctor's testimony by presenting colored autopsy photographs to the jury. Consequently, *Dant* does not provide guidance on the issue at hand.

have excluded the evidence." The Commonwealth relies on the following for its argument: 1) the judge heard both of the proposed experts speak on the subject a month before; 2) all the medical professionals who testified were in agreement as to SBS's general acceptance in the scientific community; and 3) the arguments raised by Hamilton's expert, Dr. Nichols, in his affidavit went to the "weight of the evidence" and failed to "address the admissibility standard in *Daubert* and its progeny." We disagree.

As indicated above, the test for harmless error is "whether there is any reasonable possibility that, absent the error, the verdict would have been different." *Taylor v. Commonwealth*, 995 S.W.2d 355, 361 (Ky. 1999). Thus, the issue is not whether the outcome of a *Daubert* hearing, *if* it were held, would have excluded the evidence. Rather, the issue is whether there exists a reasonable possibility that the outcome of the trial would have been different, absent the testimony that was allowed into evidence as the result of error. Because there is a reasonable possibility that the outcome of the trial would have been different, absent the testimony and evidence of SBS and in light of the fact that there were no outward signs of trauma or injury, the failure to hold a *Daubert* hearing was not harmless.

In light of our conclusion, we find Hamilton's remaining contentions of error moot. Nevertheless, for purposes of clarification on remand, we review two of Hamilton's arguments concerning the jury instructions tendered in this case.

■ First, Hamilton contends that the trial court improperly denied his request for jury instructions on second-degree criminal abuse and third-degree criminal abuse because "the proof would have supported both of these lesser offenses, and a conviction as to either would have precluded a conviction for first-degree wanton assault." Regardless of whether the proof would have supported second or third-degree abuse, it was the sole province of the Commonwealth to decide whether to indict Hamilton on second or third-degree abuse. Because the Commonwealth did not indict Hamilton on either of those offenses, the trial court would have been required to include such instructions only if second or third-degree abuse were considered "lesser-included offenses" of first-degree wanton assault. As stated by the Kentucky Supreme Court, second or third-degree abuse are not lesser-included offenses of assault:

> Criminal abuse occurs where the victim is in the custody of the assailant and is an alternative to the crime of assault. Depending on the facts, the prosecutor may seek an indictment for assault if the circumstances warrant it. Criminal abuse is not a lesser-included offense of first or second degree assault. It covers situations where a person is in the custody of another and is injured by an abusive act of that person.

*Commonwealth v. Chandler*, 722 S.W.2d 899, 900–01 (Ky.1987). Thus, we find no error on this point.

Second, Hamilton contends that the trial court erred in instructing the jury on second-degree assault as a lesser-included offense of first-degree wanton assault. Specifically, Hamilton claims that second-degree assault, as instructed by the trial court, required a finding that he "intentionally caused a serious physical injury" to his son; in contrast, first-degree wanton assault, as instructed by the trial court, required a finding that he acted wantonly, rather than intentionally. Thus, Hamilton argues, as the instructions tendered by the trial court on second-degree assault required a more culpable state of mind than first-degree wanton assault,

second-degree assault should not have been considered a "lesser-included offense" of first-degree wanton assault, the instruction was improperly given to the jury.

In Kentucky, assault may be committed with either of two culpable states of mind: intentional or wanton. As Hamilton points out in his brief, he was indicted on one count of first-degree wanton assault. Although second-degree assault may entail a wanton state of mind, the trial court instructed that it required a showing of intent. Thus, as an intentional offense requires a more culpable state of mind than an offense stemming from wantonness, an intentional offense cannot be a lesser-included offense of a crime requiring a wanton mental state.

We agree with Hamilton that the instruction on second-degree assault, under the circumstances, was erroneous. While this could be considered harmless error in light of the jury's finding at the first trial, on remand the trial court should give a proper instruction coinciding with the indictment of the first-degree wanton assault.

The judgment of the McCracken Circuit Court is reversed, and this case is remanded to the trial court for further proceedings consistent with this opinion.

ALL CONCUR.